**Michael Vincent GEAGAN et al.,
Petitioners, Appellants,**

v.

**John A. GAVIN, Superintendent, Massachusetts Correctional Institution,
Respondent, Appellee.**

**No. 5643.**

United States Court of Appeals
First Circuit.

Heard Nov. 2, 1960.

Decided June 30, 1961.

Manuel Katz and Lawrence F. O'Donnell, Boston, Mass., with whom Paul T. Smith, Robert DeGiacomo and Henry Sontag, Boston, Mass., were on the brief, for appellants.

John F. McAuliffe, Sp. Asst. Atty. Gen., with whom Edward J. McCormack, Jr.,

Atty. Gen., Garrett H. Byrne, Dist. Atty., Boston, Mass., and Gerald F. Muldoon, Sp. Asst. Atty. Gen., were on the brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

This is an appeal by eight persons, who with three others [1] have come to be known as the "Brink's Robbers," from a judgment of the United States District Court for the District of Massachusetts, Wyzanski, J., denying their petition for a writ of *habeas corpus,* and from an order denying their motion for a new trial or for amended findings of fact and conclusions of law.

After dark on January 17, 1950, a band of armed men dressed alike and wearing rubber Halloween masks entered the premises of Brink's Incorporated [2] in downtown Boston by means of pass keys, trussed the Brink's employees on guard and made off with $1,219,000 in cash. Hue and cry, modern version, was promptly raised but nevertheless the perpetrators of the crime succeeded in evading police traps and road blocks and made good their escape. Naturally enough a successful crime of such magnitude executed so dramatically and with such daring received extensive local and national coverage in the newspapers and on television and radio.

Six years later, on January 13 and January 16, 1956, the eight appellants and the three other persons mentioned above were indicted by a grand jury in the Superior Court of the Commonwealth of Massachusetts for Suffolk County for a variety of offenses arising out of the "Brink's Robbery." This event and the ensuing arrests of the accused were also covered extensively in the news media. On August 6, 1956, the eight appellants on pleas of not guilty entered for them by the court on their standing mute were set to the bar to be tried by jury on some of the indictments. Two months later, on October 6, 1956, they were found guilty as charged in the indictments on which they were tried and on October 9, 1956, they were sentenced to long terms of imprisonment.

On appeal the Supreme Judicial Court of the Commonwealth of Massachusetts affirmed the judgments of sentence, Commonwealth v. Geagan & Others, 1959, 339 Mass. 487, 159 N.E.2d 870, certiorari denied 361 U.S. 895, 80 S.Ct. 200, 4 L.Ed. 2d 152, and thereupon on January 18, 1960, the appellants petitioned the court below for *habeas corpus.* That court, accepting the allegations of the petition as true and ruling in accordance with Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, that available state remedies had been exhausted, entered judgment denying the petition and issued a certificate of probable cause for appeal pursuant to Title 28 U.S.C. § 2253.

The appellants' contention on this appeal, in the court below and in both the Superior and Supreme Judicial courts of Massachusetts, is that massive sustained publicity instigated and stimulated in part by federal and state enforcement officials poisoned the public mind against them to such an extent that they could not and did not have a fair trial in conformity with the due process requirement of the Fourteenth Amendment of the Constitution of the United States. More specifically, their claim is that there was such extensive prejudicial publicity attendant upon their indictment, arrest and trial purporting to emanate and emanating from official sources that the grand jury which indicted them was prejudiced, that the petit jury which tried them was prejudiced and that the prejudice was so deep-seated and ineradicable as to make it impossible for them to obtain a fair trial at any time during the period within which they

1. Joseph J. "Specks" O'Keefe, who later pleaded guilty and turned state's evidence and Stanley A. Gusciora and Joseph S. Banfield, both deceased.

2. Brink's, Incorporated, is a corporation engaged in the business of transporting money and valuables, typically in armored automobiles.

might have obtained a constitutionally speedy trial.

■ Although counsel for the appellants presented their contention to the trial court by seasonable motions to quash, pleas in abatement and pleas in bar, they at no time prior to or during the trial asked for any judicial action designed to curb or control continuance of the publicity of which they complained.[3] Nor did counsel for the appellants move for a change of venue or for a continuance. Since in the present state of the law it is not clear that any court, state or federal, has any practically effective means at its disposal for preventing "trial by newspaper," to use a catch phrase,[4] see Toledo Newspaper Co. v. United States, 1918, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186, overruled by Nye v. United States, 1941, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172; Bridges v. State of California, 1941, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192; Pennekamp v. State of Florida, 1946, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295; Craig v. Harney, 1947, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546, and since there is certainly some basis for counsels' assertion that the prejudicial publicity was so widespread and continuous that the defendants would fare no better in any other county in Massachusetts or be any better off if the trial were postponed for any reasonable length of time, it seems to us that for the purposes of this particular appeal the defendants should stand no worse for their counsels' failure to ask for some sort of court order limiting publicity or for a change of venue or a continuance. Cf. Delaney v. United States, 1 Cir., 1952, 199 F.2d 107, 116, 39 A.L.R.2d 1300. We shall therefore proceed to the merits.

But this does not mean that we shall undertake to cover once more the same ground already so well covered by the highest court of the Commonwealth of Massachusetts and the District Court. The opinion of the Massachusetts Supreme Judicial Court written by Mr. Chief Justice Wilkins was aptly described by the court below as "a model of clarity in its exposition of the record in the state court, of the issues presented, and of the governing authorities." We can say the same with reference to Judge Wyzanski's opinion for the District Court. Nothing would be gained by repeating what has already been so well said. Therefore on this appeal our consideration will be limited to the question whether, in the light of Irvin v. Dowd, 81 S.Ct. 1639, decided by the Supreme Court of the United States on June 5, 1961, the defendants, in spite of the publicity of which they complain, were nevertheless accorded a fair trial by a panel of impartial, indifferent jurors as required by the due process clause of the Fourteenth Amendment of the Constitution of the United States.

■ The question whether jurors are impartial in the constitutional sense is one of mixed law and fact as to which the challenger has the burden of persuasion, for: "Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside. * * *" Reynolds v. United States, 1878, 98 U.S. 145, 157, 25 L.Ed. 244, quoted with approval in Irvin v. Dowd, supra. And, to decide whether the challenger has sustained his burden, it is the duty of this court as stated in the case last cited "to independently evaluate the *voir dire* testi-

---

3. At oral argument in this court counsel admitted that they considered making application to the trial court for some sort of order limiting publicity but after conferring with one another decided not to do so.

4. Perhaps when an appropriate occasion arises the Supreme Court will see fit to

shed more light on the exceedingly difficult and vexing problem of judicial control over slanted pre-trial publicity. See Mr. Justice Frankfurter's discussion of this problem in State of Maryland v. Baltimore Radio Show, 1950, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562.

mony of the impaneled jurors." [81 S. Ct. 1643.]

Some general observations are in order, however, before taking up the *voir dire* examination of the veniremen generally and the testimony on *voir dire* of the two petit jurors whom the appellants specifically charge with harboring constitutionally disqualifying prejudice.

It can certainly be said that the Brink's Robbery excited widespread public interest and no little general public amazement at the obvious skill with which it was planned and the dramatically bold and daring way in which a group of armed and masked men invaded supposedly impregnable premises and successfully made off with a million two hundred and nineteen thousand dollars. It cannot be said, however, that the robbery stirred general feelings of rage and revulsion touching off widespread public clamor for vengeance on those accused of perpetrating it, for it was not accompanied by any physical violence except the disarming and trussing of the guards on duty.[5] The crime certainly did not arouse public passion and emotion in any way comparable to that aroused by the rape and murder of a six-year-old girl, Stroble v. State of California, 1952, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872, or the slaughter by a husband of his wife and children, Ciucci v. State of Illinois, 1958, 356 U.S. 571, 78 S.Ct. 839, 2 L.Ed. 2d 983, or multiple murders, Irvin v. Dowd, supra, see also the earlier report of the same case, 1959, 359 U.S. 394, 79 S.Ct. 825, 3 L.Ed.2d 900. Far less did the Brink's Robbery excite public hysteria accompanied by mob violence such as the rape of a white woman by four armed negroes, Shepherd v. State of Florida, 1951, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740, or the killing of white men by negroes in Arkansas, Moore v. Dempsey, 1923, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543. Not only was the death penalty not involved but also no feelings of race or religious prejudice were aroused nor did the crime have any even indirect political innuendo as in Delaney v. United States, 1 Cir., 1952, 199 F.2d 107, 39 A.L.R.2d 1300.

Furthermore, the trial itself, far from being mob-dominated as in Moore v. Dempsey, supra, was conducted from first to last with dignity and decorum in a calm judicial atmosphere.

Under these circumstances it is not surprising that no very serious difficulty, as in Irvin v. Dowd, was encountered in finding jurors who at least professed not to have formed an opinion of guilt. Instead of 90% of the prospective jurors examined on the point expressing some degree of opinion that the accused was guilty, 306 of the 1104 or almost 28% of the prospective jurors called in the case at bar professed to have formed no opinion at all as to the guilt or innocence of the accused.[6] Moreover, in Irvin v. Dowd eight of the twelve jurors eventually selected said on *voir dire* that they thought the accused was guilty, whereas in the case at bar only two of those chosen to sit admitted to any preconception, and neither of them disclosed or was asked whether he thought the accused were guilty or innocent.

---

5. Some pretrial publicity suggested that the appellants may have been responsible for the disappearance or death after the crime of certain local underworld characters "because they knew too much." But in this day and age the "rubbing out" of a few small-time hoodlums is not enough to cause any general public clamor for revenge.

6. Further statistical comparison along this line with Irvin v. Dowd is impossible for lack of adequate data, for two hundred and thirty-nine prospective jurors were excused by the justice presiding at the trial for reasons of health or hardship, in many instances before they were asked whether they had formed any opinion or not, and in only a very few instances do we know whether the 659 prospective jurors who admitted that they had formed some sort of opinion thought the accused guilty or innocent. Since the few who said what their opinion was were not of the same view, some thinking the accused guilty and others innocent, we can hardly assume that all those with an opinion thought the defendants guilty.

248

In conformity with long established local practice, the *voir dire* examination of all prospective jurors was conducted not by counsel but by the trial justice, although on occasion the justice put questions suggested by counsel for the defendants. His examination was characterized by the Supreme Judicial Court of Massachusetts as "patient and careful" [339 Mass. 487, 159 N.E.2d 882] which is certainly not an overstatement. An examination of the record shows that full disclosure of the nature of the case and the names of the accused and their counsel was made to each group of veniremen as it was called, and that each individual as he came forward was carefully examined as to any interest, bias or prejudice he might have. Even after it became evident that the defendants intended to exhaust all the peremptory challenges allowed them by statute (262) before they would accept a single juror, and the first juror was not seated until the thirteenth day of examining veniremen, the justice nevertheless continued carefully and thoroughly to examine each prospective juror as he was called.

We turn now to the *voir dire* examinations of the two jurors charged with harboring constitutionally disqualifying prejudice against the defendants. In material part their examinations were as follows:

Juror Charles A. Wolusky

"Q. Have you formed or expressed any opinion as to the guilt or innocence of any of these defendants? A. I don't have a firm opinion.

\*   \*   \*   \*   \*   \*

"Q. Are you aware of any bias or prejudice for or against anyone in this case? A. Not that I know of.

\*   \*   \*   \*   \*   \*

"The Court: The juror is indifferent.

\*   \*   \*   \*   \*   \*

"Mr. Smith: The same objection and exception and challenge for cause for all defendants. Specifically we object and except to your Hon-

or's ruling that the venireman stands indifferent, because of the statement that he, and I quote, said,. 'I don't have a firm opinion,' which indicates he has some opinion.

"The Court: Very well. When I asked you that question I understood that you would be able to take the oath of a juror, to well and truly try the issues between the Commonwealth and the defendant, according to the evidence, that would be uninfluenced in any way by any preconceived notions.

\*   \*   \*   \*   \*   \*

"The Juror: You are right, because I don't convict anyone unless. I know the facts, and I don't know the facts."

Juror Cornelius A. Leary

"Q. Do you know of any reason why you cannot serve on this jury? A. No, your Honor.

"Q. Have you expressed or formed any opinion as to the guilt or innocence of any of these defendants? A. I have a tentative opinion; could be changed.

\*   \*   \*   \*   \*   \*

"Q. If you are accepted as a juror, an oath will be administered to you that you will well and truly try the issues between the Commonwealth and these defendants, according to the evidence, which means that you should serve with an open mind and decide the case purely on the evidence as it will be presented here, uninfluenced by any preconceived notion, ideas, or opinions that you may now have. Do you think you could take that oath and adhere to it faithfully? A. I do, your Honor.

\*   \*   \*   \*   \*   \*

"Q. Are you aware of any prejudice or bias for or against anyone in this case? A. No, your Honor.

"Q. Do you know of any reason that would prevent you from reaching a fair and impartial decision or verdict exclusively on the evidence

and under the law as the Court will give you the law? A. No.

\* \* \* \* \* \*

"Mr. De Giacomo: If your Honor please, before the juror is sworn, since the interrogation has indicated that the juror testified that he had a tentative opinion, but it could be changed, would your Honor address questions to the juror as to whether or not he knows how much evidence would be necessary to change his opinion?

"Q. [By the Court] Mr. Leary, if you are sworn as a juror, you will be instructed by the Court that every defendant is presumed to be innocent, and that it will be your duty to bring in a verdict, return a verdict of Not Guilty, unless you are convinced beyond a reasonable doubt on the evidence and the law that he is Guilty.

"Now, do you think that your opinion, or whatever notions you have, will interfere with carrying out that oath, those instructions? A. No, your Honor."

These *voir dire* examinations speak eloquently for themselves. The most that they show is that the jurors had formed some impression or opinion as to the merits of the case as might well be expected of intelligent and alert citizens of the community. But, as the Court pointed out in Irvin v. Dowd: "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." Certainly prospective jurors, like everyone else, suffer from a variety of biases and prejudices of which they are not aware. The best that the courts can do, however, is to take a prospective juror's word for his impartiality or for his capacity to overcome a tentative opinion on the merits, valued in the case of the trial judge, by an estimate of the prospective juror's character and intelligence formed by observation of the general appearance of the individual concerned and his demeanor under examination. Moreover, one who is aware of a slant of mind may not only be more intelligent than one who is not, but, also, being aware and more intelligent, be better able to make due allowance for his predilection and guard against it in conscientiously performing his sworn duty as a juror.

On our own independent evaluation of the *voir dire* examination of the impaneled jurors the appellants' challenge fails. It seems clear to us that under the circumstances of this case the jurors fully meet the constitutional test of impartiality laid down in Irvin v. Dowd.

Judgment will be entered affirming the judgment and order of the District Court.