Peter CALO, Defendant, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 6357.

United States Court of Appeals
First Circuit.

Nov. 30, 1964.

Joseph Mainelli, Providence, R. I., for appellant.

William J. Gearon, Asst. U. S. Atty., with whom Raymond J. Pettine, U. S. Atty., was on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

■ . This is an appeal by a defendant convicted of receiving wagers on behalf of a person liable for the occupational tax without having paid his own, in violation of 26 U.S.C. §§ 7203 and 7262. His brief designates five questions, some of which are further subdivided. A number of these matters, however, are not before us. We have said too many times that we will not consider questions of the sufficiency of the evidence, or of alleged inadequacies of the charge, in the absence of a sufficient record appendix. See our Rule No. 23; Chernack v. Radlo, 1 Cir., 1964, 331 F.2d 170; Haddad v. Border Express, Inc., 1 Cir., 1962, 303 F.2d 134.

■ The record does show the substance of defendant's attack on the search warrant. There is, however, nothing in his point. The affidavit on which the warrant was based was not insufficient because some of it depended upon hearsay. Taking the affidavit as a whole, the Commissioner was well justified in finding probable cause. Nor was the warrant defective in giving the name of only one of the affiants. It

is true that F.R.Crim.P. 41(c) requires a statement of the "names," but this does not oblige reference to affidavits which were superfluous. The principal (and named) affiant stated that he had learned of a certain fact from a qualified government agent having the requisite personal knowledge. This would have been enough without filing the agent's separate affidavit directed to that sole issue, Jones v. United States, 1960, 362 U.S. 257, 272, 80 S.Ct. 725, 4 L.Ed.2d 697, and without disclosing the agent's name. Rugendorf v. United States, 1964, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887. We will not hold the requirements of the warrant to have been increased simply because the agent's name was disclosed by the filing of a needless affidavit. Cf. Masiello v. United States, 1962, 113 U.S. App.D.C. 32, 304 F.2d 399, 402.

The fact that the warrant described the articles to be seized as "bet slips, so-called," and "run down sheets, so-called, and like paraphernalia" (ital. suppl.) did not make the description vague and insufficient. See Nuckols v. United States, 1938, 69 App.D.C. 120, 99 F.2d 353, 355, cert. den. Floratos v. United States, 305 U.S. 626, 59 S.Ct. 89, 83 L.Ed. 401; United States v. Joseph, D.C.E.D.Pa., 1959, 174 F.Supp. 539, 544, aff'd 3 Cir., 278 F.2d 504, cert. den. 364 U.S. 823, 81 S.Ct. 59, 5 L.Ed.2d 52.

■ The fact that the officer conducting the search, after the issuance of the warrant, failed for a number of minutes to exhibit it, conceivably might have involved certain consequences had there been resistance. The officer, however, gained admittance peaceably. Thereafter he produced the warrant while the search was in progress. There was no basis for a motion to suppress. Nordelli v. United States, 9 Cir., 1928, 24 F.2d 665.

One matter, however, gives us difficulty. Trial began in Providence, Rhode Island on November 12, 1963, and evidence continued through the 13th. The afternoon of the 13th there appeared in a Providence paper an announcement of . a one-hour documentary television pro-

gram on "organized crime" at the conclusion of which the U.S. Attorney would appear, "live," to "describe the purpose of an upcoming federal grand jury probe of crime in Rhode Island." An advertisement featured, in capital letters, the title ANATOMY OF A CRIME, and carried a photograph of a seeming robbery. In a Providence paper the following morning there was a partial account of the U.S. Attorney's talk. Seemingly the U.S. Attorney appealed for informants and for witnesses to appear before a grand jury. To emphasize the alleged need he made charges that illegal gambling in Rhode Island grossed $100,000,-000 annually, and that the "unbelievable network of gambling" was the most lucrative branch of organized crime activities which include prostitution, extortion, corruption, etc. The "corner bookie" was connected to the "underground." Witnesses who appeared would be promised anonymity.

Immediately that morning the defendant moved for a mistrial, duly offering copies of the two newspaper accounts. The court denied the motion and sent the case to the jury. What transpired at the hearing of the motion does not appear in the record appendix. However, it is common ground that the jurors were not polled as to whether they had seen or heard of the newspaper accounts.

■ Judge HARTIGAN is of the view that it was not to be assumed that the jurors saw the newspaper accounts, or heard the television program, and that defendant should have requested that the jurors be polled. Admittedly, it is a question of judgment whether publicity is of such a degree that it may be presumed that it came to the attention of at least some of the jurors. In the opinion of a majority of the court this publicity was so massive and so timed that the

defendant made a prima facie showing, and the government should have been the one to seek to establish that no juror had had these matters come to his attention. A case almost exactly in point is Briggs v. United States, 6 Cir., 1955, 221 F.2d 636. See also Henslee v. United States, infra. We pass, therefore, to a consideration of whether the publicity had a prejudicial effect.

■ Among other deficiencies in the record the charge is not printed and it does not appear what the court may have said to the jurors in an attempt to disabuse their minds of any emotion or prejudice that may have been caused by the U.S. Attorney's remarks. It must, accordingly, be assumed that the court sought to do this in the most careful and appropriate manner. In Chief Judge WOODBURY's view such assumed instructions were enough, the more particularly since there was no specific mention of the defendant in the U.S. Attorney's address. It follows that in the opinion of the majority of the court, the defendant has failed to show error.

■ Although it is happily unique, so far as can be discovered, for a U.S. Attorney, while engaged in the trial of a criminal case, to go on the air in such a manner, the writer of this opinion would like to express his dissenting view to the proposition that an instruction by the court, no matter how well expressed, should be regarded as drawing this sort of a sting. The U.S. Attorney is peculiarly charged with the duty of seeing that a defendant receives a fair trial. Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314. His remarks here were pointed and vigorous. Their clear tenor was that illegal gambling was enormously widespread; [1] that this, in turn, financed organized crime of the most vicious variety; that

---

1. This, of course, was not on-track gambling, but betting placed with "corner bookies" which, in turn, allegedly fed the organized criminal underground. Applying the U. S. Attorney's figure to the 1960 Rhode Island census, this meant over $100 apiece for every man, woman and child in the state. His adding that

the situation was not as "uncontrollable" as other people had asserted scarcely seems helpful. It would seem to the writer that the U. S. Attorney could not have recited such alarming "facts" in the courtroom, and that it should be no less serious in effect to address the jurors outside.

the "common bookie," i. e., persons in the alleged position of this defendant, was an important cog in the structure, and that the government so badly needed help that the U.S. Attorney felt warranted in going on the air to ask for it. All of this, in the writer's opinion, could not help but whet the apprehensions of jurors as to the great public seriousness of the defendant's behavior. In point of fact the gravamen of his offense, if any, was not gambling, (assuming that to be as heinous as represented) but merely failing to pay a $50 tax. The federal government had no other legal interest. United States v. Kahriger, 1953, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754. The U.S. Attorney's statements were not only inflammatory, but were all out of proportion to the matter involved. Handford v. United States, 5 Cir., 1957, 249 F.2d 295 (whisky tax; argument that whisky-drinking led to highway fatalities); cf. Viereck v. United States, 1943, 318 U.S. 236, 247–248, 63 S.Ct. 561, 87 L.Ed. 734; United States v. Georga, 3 Cir., 1954, 210 F.2d 45.

 It is, of course, a question of judgment how far the effect of an improper occurrence can be adequately removed from the mind, or in this case, the emotion, of a jury. The risk in this case might be considered the rub of the green had the disturbing event been one of those unfortunate extraneous influences that could not be helped. However, when it emanated from the U.S. Attorney's own conduct, the necessity for which, and particularly for its timing, can scarcely be presumed, it seems to the writer that the doubts should have been resolved in the defendant's favor. We recognized such a principle in Delaney v. United States, 1 Cir., 1952, 199 F.2d 107, at 113. In Henslee v. United States, 5 Cir., 1957, 246 F.2d 190, the court went so far as to hold that even when the jurors remained silent (for what the court felt special reasons) in response to the court's question of whether the extra-judicial publicity had come to their attention, the "much higher standard" that must prevail when the "unwanted publicity resulted from action taken by the Assistant United States Attorney" required a new trial. In the writer's view, that should happen here.

Judgment will be entered affirming the judgment of the District Court.

WOODBURY, Chief Judge (concurring).

I do not believe that the remarks of the United States Attorney at the conclusion of the television program as reported in the press, which is the only evidence we have of what was actually said, were so highly inflammatory and prejudicial that a mistrial is required as a matter of law.

From the newspaper account it would appear that the United States Attorney's remarks can be characterized as "vigorous" in calling public attention to the prevalence of off track betting, the financial rewards of that illegal activity, the tie-in of bookmaking with "prostitution, extortion, corruption, labor racketeering, shylocking and bootlegging" and in asking for public cooperation in enforcing the law. However, to complete the picture I think it should appear that immediately following these remarks the United States Attorney is reported to have said: "Special federal grand jury hearings on organized crime in Rhode Island have been called * * * not because all those crimes exist in Rhode Island or because crime is rampant or has reached an 'uncontrollable pitch' in this state."

Moreover, in this case as in Torrance v. Salzinger, 297 F.2d 902 (C.A. 3, 1962), cert. denied, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288, no reference was made to the appellant personally in the publicity of which he complains, and that to my mind distinguishes the case at bar from other cases in this circuit such as Delaney v. United States, 199 F.2d 107 (1952); Geagan v. Gavin, 292 F.2d 244 (1961), cert. denied, 370 U.S. 903, 82 S.Ct. 1247, 8 L.Ed.2d 399 (1962), and Gorin v. United States, 313 F.2d 641 (1963), cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052.

Furthermore, betting on horse races, even illegal betting through bookies, is not a crime which arouses great public passion or deep public emotion such as the crimes listed by this court in Geagan v. Gavin, supra, 292 F.2d at page 247. Betting through bookmakers is indeed illegal in Rhode Island and no doubt in a great many other states. But pari-mutuel betting on horse races at the track is legal in Rhode Island and rather generally elsewhere, at least in this part of the United States. And New Hampshire has even gone so far as to establish a state operated sweepstakes. I cannot believe that adequate instructions, which on the inadequate record before us we assume, could not eradicate from the jurors' minds any possible prejudice that might have been engendered by the publicity. I vote to affirm.