UNITED STATES of America, Appellant,

v.

Allan Michael KLEIN et al., Defendants, Appellees.

No. 77–1121.

United States Court of Appeals, First Circuit.

Argued May 31, 1977.

Decided Nov. 14, 1977.

Henry H. Hammond, Asst. U. S. Atty., Boston, Mass., with whom James N. Gabriel, U. S. Atty., Boston, Mass., was on brief, for appellant.

Albert F. Cullen, Jr., Boston, Mass., by appointment of the Court, with whom William B. Duffy, Jr., Boston, Mass., by appointment of the Court, was on brief, for defendants, appellees.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, LAY, Circuit Judge.*

LAY, Circuit Judge.

On March 5, 1975, a federal magistrate issued a warrant authorizing the search of a retail music store located in Somerville, Massachusetts, known as "D and L Limited". The warrant authorized the executing officer to seize "certain 8-track electronic tapes and tape cartridges which are unauthorized 'pirate' reproductions and also any commercial documentation and advertising materials relating thereto which are evidence of the commission of a criminal offense, to wit, the knowing and wilful infringement of copyrights secured by Title 17, United States Code, in violation of 17

---

* Of the Eighth Circuit, sitting by designation.

U.S.C. § 104. . . ." [1] In execution of the warrant three FBI agents, with the assistance of two or three experts from the music recording industry, entered the business premises of D and L where they seized 1989 eight-track tapes which the agents believed to be unauthorized reproductions of copyrighted sound recordings. Following the seizure a 10 count information was filed against the alleged owners of D and L, Allan Klein and Lawrence Weiner, charging them with selling unauthorized reproductions of copyrighted sound recordings in violation of 17 U.S.C. § 104. After pleading not guilty, the defendants filed a motion to suppress the tapes on the grounds that the warrant was issued in violation of the Fourth Amendment. The district court, the Honorable W. Arthur Garrity, Jr., presiding, sustained the motion to suppress on two grounds: First, that the warrant did not comply with the Fourth Amendment in

that it failed to circumscribe the executing officer's discretion by particularly describing the things to be seized, and second, that the tapes were seized in violation of the principles of *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), since there was not a sufficient nexus between the crime charged and the items seized. Because we find that the warrant insufficiently described the items to be seized we need not discuss the second basis for Judge Garrity's holding; we affirm the ruling of the district court.

The affidavit submitted to the issuing magistrate by Agent Saraceni of the FBI recites the facts which preceded the issuance of the warrant. [2] In the affidavit Saraceni stated that on March 3 and 4, 1975, he entered defendant's premises and on each occasion purchased an eight-track

1.   17 U.S.C. § 104 provides that:
   [A]ny person who willfully and for profit shall infringe any copyright secured by this title, or who shall knowingly and willfully aid or abet such infringement, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by imprisonment for not exceeding one year or by a fine of not less than $100 nor more than $1,000, or both, in the discretion of the court. . .

2.   The complete affidavit read:
   My name is John Saraceni. I am a Special Agent, Federal Bureau of Investigation, Boston, Mass.
   On 3/3/75 I spoke with Wayne Thomas, a salesman for Warner/Electra/Atlantic, Inc., a subsidiary of Warner Communications, Inc. Thomas' office is located at 110 H Commerce Way, Woburn, Mass.
   Thomas furnished me with an 8-track tape which was labeled "Jethro Tull War Child". The label says it was produced by "Bonanza Productions," a division of Art Sales, Inc., of Georgia. Thomas told me he purchased this tape from "D and L Limited," 239 Elm Street, Somerville, Mass., on 2/25/75, for $3.00 cash.
   On 3/3/75 I met with Mitch Huffman, District Sales Manager for Warner/Electra/Atlantic, Inc. Huffmann produced another 8-track tape entitled "Jethro Tull War Child", which he identified as being a genuine tape produced by another subsidiary of Warner Communications, Inc., to wit, Warner Brothers Records, Inc., in a joint venture with "Chrysalis Records". We then played the Bonanza tape and the Warner Brothers-Chrysalis tape, and Mr. Huffman and I both found that the sounds on the two tapes appeared to be identical.

On 3/3/75 I also spoke with William Straw, an attorney for Warner Brothers Records, Inc., 3701 Warner Boulevard, Burbank, Cal. Straw told me that copyright certificate N19790 was issued by the U.S. Register of Copyrights to Warner Brothers Records, Inc., on 10/10/74, re the "Jethro Tull War Child" tape and that Warner Brothers, Inc., had not authorized Bonanza Productions or anyone else to reproduce any part of the "Jethro Tull War Child" tape.
   On 3/4/75 I went to D and L Limited, 239 Elm Street, Somerville, where I purchased an 8-track tape entitled "Helen Reddy Free and Easy" for $3.00 cash. While on the premises I noticed approximately 500 or more 8-track tapes which, based upon my previous experience in this area, appeared to be unauthorized reproductions of commercial copyrighted tapes.
   On 2/13/75 I spoke with David Jackson, an attorney for Capitol Records, Inc., 1750 North Vine Street, Hollywood, California. Jackson advised me that the U.S. Register of Copyrights issued copyright certificate N20147 to Capitol Records, Inc., for "Helen Reddy Free and Easy" on 10/14/74, and that Capitol had not authorized anyone else to reproduce this tape. On 2/13/75 I also obtained an 8-track tape from the New England Region Sales Manager for Capitol Records, Inc., James Johnson, of 235 Elm Street, Dedham. Johnson identified that tape as being an authorized production, manufactured by Capitol Records, Inc., of the copyrighted "Helen Reddy Free and Easy". On 3/4/75 I listened to the tape that I purchased at D and L Limited and to the tape which I received from James Johnson on 2/13/75, and the sounds on the two tapes sounded identical.

tape which he later determined was an unauthorized reproduction of copyright tapes.

Since neither the warrant nor the affidavit specifies how the so-called "pirate" tapes were to be identified, the defendants assert that the warrant is an illegal "general warrant" and that the tapes seized under the warrant must be suppressed. They rely on the often repeated language of *Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927):

> The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

*Id.* at 196, 48 S.Ct. at 76. *See also Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

The *Marron* standard finds its derivation in Colonial America's aversion to writs of assistance and general warrants which placed broad discretionary authority with British custom officials to search anywhere for smuggled goods and seize anything they pleased. *See Weeks v. United States,* 232 U.S. 383, 389–91, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Boyd v. United States,* 116 U.S. 616, 623–35, 6 S.Ct. 524, 29 L.Ed. 746 (1886). *See also Stanford v. Texas, supra,* 379 U.S. at 481–86, 85 S.Ct. 506; *Marcus v. Search Warrant,* 367 U.S. 717, 724–29, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); *Frank v. Maryland,* 359 U.S. 360, 363–66, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959).

■ The present warrant does not have all the indices of a general warrant. It is limited to a search of a particular place and to particular items, that is, certain eight-track tapes and cartridges located at D and L. Neither the warrant nor the affidavit,[3] however, sets out clear standards which assure the magistrate that the executing officer will be able to differentiate a pirate reproduction from a legitimate eight-track tape. Although Agent Saraceni recounted that, based on his experience, he had "noticed approximately 500 or more 8-track tapes [in the store] which . . . appeared to be unauthorized reproductions of commercial copyrighted tapes," his affidavit does not reveal the basis of his experience or the means by which an executing officer could identify the tapes. The transcript of the hearing before Judge Garrity provides no additional illumination on Saraceni's identification methods.[4] The affidavit therefore presented the magistrate with nothing more than a generic description of the items to be seized.[5]

---

3. An affidavit may be referred to for purposes of providing particularity if the affidavit accompanies the warrant, *and* the warrant uses suitable words of reference which incorporate the affidavit. *United States v. Womack,* 166 U.S.App.D.C. 35, 49, 509 F.2d 368, 382 (1974), *cert. denied,* 422 U.S. 1022, 95 S.Ct. 2644, 45 L.Ed.2d 681 (1975); *United States v. Lightfoot,* 165 U.S.App.D.C. 177, 181, 506 F.2d 238, 242 (1974). In this case the warrant makes no reference to the affidavit. There is also no evidence on the record that the affidavit accompanied the warrant. Thus the affidavit cannot be used to provide particularity.

We do not decide the case on this ground, however, since even if the affidavit could be used, it would not provide sufficient particularity.

4. It is, of course, rudimentary that the validity of the warrant must be appraised by the facts revealed to the magistrate and not those later found to exist by executing officers. *Whiteley v. Warden,* 401 U.S. 560, 564–66, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Rice v. Wolff,* 513 F.2d 1280, 1287 (8th Cir. 1975), *rev'd on other grounds,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

5. At oral argument the United States Attorney stated that the characteristics of the pirate tapes possessed by defendants were visually "tell-tale." He related that an authorized tape had an elaborately and professionally designed advertising jacket whereas pirate jackets were usually simply and crudely done. In addition, government counsel averred that someone familiar with the recording industry would know the legitimate recording companies and the musicians that recorded with a particular company. For example, he stated an eight-track tape of Frank Sinatra which was not produced by the recording company with whom he records, and in fact is produced by an unknown company, would likely be a pirate tape. The warrant and affidavits did not mention any of these

Thus the fundamental issue before us is whether the generic description of a pirate tape is sufficient under the circumstances to comply with the Fourth Amendment.[6]

■ Relying solely on an Eighth Circuit opinion, *Spinelli v. United States,* 382 F.2d 871 (8th Cir. 1967), *rev'd on other grounds,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the government lightly brushes aside the district court's ruling in favor of the defendants. In *Spinelli* the Eighth Circuit upheld a warrant for "bookmaking paraphernalia," stating:

> When the circumstances of the crime make an exact description of the fruits and instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking.

382 F.2d at 886. This court took a similar approach in *Calo v. United States,* 338 F.2d 793 (1st Cir. 1964), involving the generic description of "bet sheets . . . run down sheets . . . *and like paraphernalia." Id.* at 794. *See also James v. United States,* 416 F.2d 467, 472–73 (5th Cir. 1969), *cert. denied,* 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87 (1970); *Nuckols v. United States,* 69 App.D.C. 120, 122, 99 F.2d 353, 355 (1938), *cert. denied,* 305 U.S. 626, 59 S.Ct. 89, 83 L.Ed. 401 (1938).

Perhaps more supportive of the government's position is the language in this court's decision in *Vitali v. United States,* 383 F.2d 121 (1st Cir. 1967), which was followed by the Second Circuit in *United States v. Scharfman,* 448 F.2d 1352 (2d Cir. 1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 944, 30 L.Ed.2d 789 (1972). The *Scharfman* case involved a hijacked shipment of fur coats. After a tip concerning the location of the fur coats, the FBI obtained a warrant to search for "fur coats, stoles, jackets and other finished fur products . . . ." *Id.* at 1353 n. 1. The Second Circuit held the description sufficient, quoting *Vitali* in support of its position: "Where goods are of a common nature and not unique there is no obligation to show that the one [sic] sought . . . necessarily are the ones stolen, but only to show the circumstances indicating this to be likely." *Id.* at 1354, *quoting Vitali v. United States, supra* at 122. *See also United States v. Averell,* 296 F.Supp. 1004 (E.D.N.Y.1969) (seizure of thousands of undescribed hijacked wigs held constitutional). It must therefore be accepted that generic descriptions are sufficient in at least some cases.

In both *Vitali* and *Scharfman* there were, in addition to the facts which indicated the common nature and nonuniqueness of the items, circumstances indicating the likelihood that the goods seized were the goods stolen. In *Vitali* the affidavit supporting the search warrant established the similarity between a group of stolen watchbands and those known to be in the defendant's possession. The court then noted that:

> Having established similarity it was then enough that it appeared that the manufacturer-consignor sold only to the watch and watch band trade, in which defendant, and AAA Acceptance Corporation which occupied the premises, did not appear to be, and that the manufacturer had no record of sales to either of them.

characteristics of pirate tapes. Furthermore, there is no indication on the face of the warrant that the people executing the warrant would be experts in the field. This information was not disclosed in the district court nor was the information given to the magistrate prior to execution of the warrant.

**6.** Courts have often invalidated warrants which failed to include even a generic description of the property to be seized. In *Rice v. United States,* 24 F.2d 479 (1st Cir. 1928), for example, this circuit overturned a warrant authorizing an agent "to search and ascertain if any fraud upon the internal revenue service has been or is being committed in or upon or by use of said premises." *Id.* at 480. This circuit had previously held constitutionally inadequate the grant of authority to "enter said premises . . . to investigate and search into and concerning said violations. . . ." *Giles v. United States,* 284 F. 208, 213 (1st Cir. 1922). In the present case the part of the warrant authorizing seizure of "materials relating *thereto* which are evidence of the commission of a criminal offense . . . in violation of 17 U.S.C. § 104 . . . ," is highly suspect under these decisions. We confine our decision however, to the seizure of the tapes.

*Vitali v. United States, supra* at 122. Thus, a magistrate would have known that the executing officer, in seizing Speidel watchbands from an establishment not in the watch or watchband trade, was not likely to violate any personal rights.

In *Scharfman* a particular shipment containing hundreds of furs had been hijacked, an informant, "himself an experienced furrier," alerted FBI agents to the fact that furs from the shipment were in the defendant's premises, and an employee of the shipment's owner positively identified a fur coat in defendant's store as being part of the hijacked load. Given these facts it could reasonably be inferred that a large collection of similar contraband was in the defendant's possession and that for all practical purposes that collection could not be precisely described for the purpose of limiting the scope of the seizure.

█ The present case is different in two important respects. First, the affidavit and the warrant failed to provide any before the fact guidance to the executing officers as to which tapes were pirate reproductions. The two bases revealed to the magistrate to determine which were pirate tapes were (1) aural comparison to see if an authorized reproduction was identical with the suspect tape, and (2) investigation with holders of copyrights to see if the suspect reproductions were authorized. In each instance such investigation could occur only *after* seizure. The warrant does not reveal with any degree of certainty that authorized tapes will not be seized.[7] Moreover, this defect could, we think, have been remedied if all the relevant information available to the government had been properly set forth. We refer, see n. 5 to averments detailing the background and expertise in the field of detecting pirate tapes of the

agent and such current indicia of illegality as the crudeness of tape jackets, the obscurity of recording company names, and the lack of known association of such a company with a known artist.

The second distinction is even more crucial. While the level of particularity required in a warrant may decline when there is reason to believe that a large collection of similar contraband is present on the premises to be searched, there must be specific and detailed foundation for such a belief. There was none here. Had Agent Saraceni's affidavit detailed his expertise in this area, indicated the basis upon which he had concluded that 500 or more pirate tapes were on the premises (such as visual indicia noted above), and explained how those indicia identify pirate tapes to the trained observor, a valid warrant could have been issued. Thus the government failed to meet two similar but significantly different tests. It failed to establish that there was a large collection of contraband in the defendant's store and it failed to explain the method by which it intended to differentiate that contraband from the rest of defendant's inventory. Furthermore, the government failed to meet these tests in a situation in which the necessary additional information could easily have been presented to the magistrate without any undue burden on enforcement personnel.

█ Moreover, we do not believe that the particularity requirement of warrants can be fulfilled by the uninformed speculation of magistrates or even judges as to whether one form of contraband or another can be distinguished from legitimate similar products by agents who may or may not be experts in the field. We confess to having been ignorant of how pirate tapes can be distinguished from legal merchandise until

7. As Judge Garrity observes in his district court opinion:

> The effect of the execution of the search warrant in this case was to put the defendants out of business as a practical matter. About 80% of the defendants' tape inventory was seized. A ten-count information was eventually filed, including charges based upon tapes seized during the search in ques-

> tion, but no more than a fraction of the nearly 2,000 tapes seized would be admissible in any event. . . . We are apprehensive lest the process of the court be used to impose severe economic sanctions upon businessmen suspected of criminal offenses independently of criminal sanctions surrounded by due process of law.

informed by the United States Attorney at oral argument.[8]  Similarly, it might be that some other form of contraband, black market drugs for example, is different in color, size, shape, and packaging from the regular commercial products.  However, we do not see that this information is relevant if it is not presented to the magistrate before hand.  A warrant for "stolen", "pirate", or "illegal" goods, be they watches, drugs, clothing, or tapes does not become sufficiently particular by after the fact explanations as to how these products were differentiated from legal merchandise when the seizures were carried out.

The decisions of the Supreme Court, although not directly in point, provide basic guidance as to when a generic description is sufficient.  In *Steele v. United States No. 1*, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925), the Supreme Court, citing *Elrod v. Moss*, 278 F. 123 (4th Cir. 1921), announced that "the description [of] 'cases of whiskey' is quite specific enough to uphold a search warrant." 267 U.S. at 504, 45 S.Ct. at 416.  An examination of *Elrod* reveals, however, that this generic description was sufficient because whiskey was contraband during prohibition.  There was, therefore, no danger that a citizen would be deprived of his lawful property because of the imprecision of a generic description.[9]

Since *Steele* the Supreme Court has only indirectly confronted the constitutional propriety of generic descriptions.  When the issue has been raised, it has been in the context of the First Amendment where free speech issues predominate.  *See Stanford v. Texas, supra,* and *Marcus v. Search Warrant, supra.*  In *Marcus* the Court struck down a search warrant authorizing seizure of "obscene materials."  Although the Court's emphasis concerned encroachment of First Amendment rights, the basic premise of the *Marron* case was reiterated in condemning a warrant in which there exists "no guide to the exercise of informed discretion  .  .  ." of the executing officer.  367 U.S. at 732, 81 S.Ct. at 1716.  Fundamental to the Court's concern was what the court perceived as the impossibility of executing the warrant "with any realistic expectation that the obscene might be accurately separated from the constitutionally protected."  *Id.*  We find this language helpful here.  The adequacy of a warrant cannot be considered in isolation from the underlying rationale for the warrant requirement.  In *United States v. Johnson,* 541 F.2d 1311 (8th Cir. 1976), the Eighth Circuit held that "[t]he underlying measure of adequacy in the description is whether given the specificity in the warrant, a violation of personal rights is likely."[10]  *Id.* at 1313.

8.  The dissent assumes the magistrate was informed of the agent's alleged prescience to distinguish the pirate reproductions from the legitimate tapes.  This overlooks that the agents told the magistrate that they possessed only two limited after the fact bases to determine whether the seized tapes were actually illegal reproductions.  Furthermore, it is well settled that an affidavit cannot be rehabilitated in post-arrest hearing by information known to the agents but not disclosed to the magistrate.  See *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

9.  The court in *Elrod v. Moss*, 278 F. 123 (4th Cir. 1921), held:

The protection of the rights of the accused does not require that the Constitution be construed to exact the same degree of particularity of description in search warrants for contraband liquors, because there is no right of property in contraband liquor, and hence there can be no danger to the citizen of being deprived of property which he is lawfully entitled to hold against the state.
*Id.* at 129.

10.  In analyzing a similarly non-specific warrant, the Illinois Supreme Court, in *People v. Prall*, 314 Ill. 518, 145 N.E. 610 (1924), stated:

The most serious defect, however, is the want of particular description of the property sought to be seized.  The warrant issued to the sheriff described the property as "certain automobile tires and tubes," and directed the sheriff to search the premises of plaintiff in error for "said stolen goods and chattels." *In the case of stolen property which can be readily described, the Constitution requires a description sufficiently particular to identify the articles sought to be seized. Frost v. People*, 193 Ill. 635, 61 N.E. 1054, 86 Am.St. Rep. 352. *A minute and detailed description of the property to be seized is not required, but the property must be so definitely described that the officer making the search will not seize the wrong property.  Where, as*

Thus, we conclude that because the affidavit and the warrant failed to provide any before the fact guidance to the executing officers as to which tapes were pirate reproductions there exists a substantial and unjustifiable likelihood of a violation of personal rights. The probability of violation is enhanced when one considers the complex nature of the search and the fact that the place being searched is a retail outlet for sound recordings with thousands of tapes in stock.[11] In light of the information available to the agents which could have served to narrow the scope of the warrant and protect the defendants' personal rights, the warrant was inadequate.

Under the circumstances, we have no alternative other than to sustain the district court.

*Judgment is affirmed.*

CAMPBELL, Circuit Judge (dissenting).

The fourth amendment provides that no warrants shall issue except as they particularly describe the place to be searched and the things to be seized. The question here is whether a warrant authorizing seizure at a particular store of "certain 8-track electronic tapes and tape cartridges *which are unauthorized 'pirate' reproductions*" [emphasis supplied] is defective for want of a particular description of the things to be seized. As my brothers point out, the fourth amendment does not require a "mi-

nute and detailed description of the property to be seized, but the property must be so definitely described that the officer making the search will not seize the wrong property." *People v. Prall,* 314 Ill. 518, 522–23, 145 N.E. 610, 612 (1924). I disagree with my brothers' conclusion that under the circumstances of this case the requisite clarity was lacking.

First, I would not frame the issue as whether a "generic" description is proper. I think of a generic description in this context as delineating a class that potentially includes both seizable and non-seizable goods, for example "certain automobile tubes and tires", *People v. Prall, supra,* or "fur coats, stoles, jackets and other finished fur products . . . ." *United States v. Scharfman,* 448 F.2d 1352 (2d Cir. 1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 944, 30 L.Ed.2d 789 (1972). The trouble with a generic description is that it does not direct the officer which articles to select for seizure from the described, generally inoffensive, class. While a generic description may sometimes be sufficient—if, for example, it is narrowed by other circumstances, *see United States v. Scharfman, supra; Vitali v. United States,* 383 F.2d 121 (1st Cir. 1967)—it raises the problem of conferring free-wheeling discretion upon the officer. But the description in issue is not generic in the sense just described. It is limited to an identifiable class of tapes, viz. unauthorized

---

in the case of gambling paraphernalia, the purpose is not to seize specified property, but only property of a specified character, which by reason of its character is contraband, a description by designating its character is sufficient. In this case, however, the property described is "certain automobile tires and tubes," which is property that may be found in great quantities and which is subject of lawful trade in every city in the United States. There is no effort to identify these tires and tubes by name, number, color, size, or material. . . . *There was nothing in the warrant which gave the sheriff information by which he could select certain property within the description in the warrant and refuse to take other property equally well described in the warrant.* The warrant was insufficient . . . .
*Id.* at 522–23, 145 N.E. at 612 (emphasis added).

11. The context and size of the seizure differentiate this case from the heroin analogy suggested by our brother in dissent. We must reemphasize that we are dealing here with a mass seizure of most of the inventory of a retail establishment. In the typical heroin seizure pursuant to a warrant, if the police officer is over-zealous or incorrect in his judgment that the substance he seized is heroin, he is likely to have deprived the defendant of a few ounces of sugar or talcum or some other similar substance. We can hardly imagine a mass seizure of heroin in the context of a business with large quantities of similar products. Certainly in the example we noted *supra* at page 9 of a search for black market drugs, we would require a more carefully defined description in a warrant than "unlicensed amphetamines" before we permitted a mass search and seizure of a retail pharmacy's inventory.

"pirate" reproductions, *all* of which constitute seizable evidence of a wilful criminal violation. Like the "whiskey" mentioned in *Steele v. United States No. 1*, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925), none of the items in the described class is innocent.

I do not mean to suggest that an overly general description in a warrant would in every case be adequately narrowed by limiting seizure to items termed "illegal". But if as here unauthorized "pirate" items can be distinguished, visually as well as aurally, with a reasonable degree of accuracy, and if identifying them demands judgments that are more factual than legal, the concern that agents will inadvertently or purposely violate personal rights in the course of a seizure under the warrant is greatly diminished. A warrant thus authorizing seizure of "unauthorized 'pirate' reproductions" is not so general as it might first appear; issued upon probable cause, it meets the constitutional requirement of particularity. No discretion to pick and choose among "innocent" and "guilty" items is conferred.

The question is simply whether the description, "unauthorized 'pirate' reproductions", conveys enough information so that an executing officer can be expected to identify and seize only such illicit tapes, and do so without unreasonably disturbing other items. I believe the description here is clear enough for such purposes. According to the evidence, pirated tapes can readily be ascertained, both from their appearance (they are said to have shoddy, amateurish covers and lettering and to look quite different from non-pirated items) and by checking the manufacturer's name against those of the legitimate companies, all or most of which are well-known. There must be catalogs and lists showing what tapes are put out by what legitimate firms. Identification would seem little more difficult than executing a routine warrant authorizing the seizure of counterfeit bills.

Appellees do not, indeed, claim that any identification problems arose here or that the tapes seized were *not* pirated. Since it seems well within the ability of agents to make this distinction and therefore execute the warrant, I do not see how the warrant fails to measure up to the fourth amendment requirement that the property to be seized be particularly described. And while I agree with my colleagues that additional descriptive material in the warrant would have done *no harm*, I see no constitutional necessity of inclusion of "do it yourself" instructions [1] or a biographical sketch showing the expertise of the agent who initially bought pirated tapes at the shop (and who stated in the affidavit that he had noticed 500 or more such pirated tapes in the shop "based upon [his] previous experience in this area"). In short, I think my brothers overestimate the difficulty of executing this warrant correctly. The agents had plain directions as to what to seize; they seized anything else at their peril. Certainly if the agents had seized substantial quantities of non-pirated tapes they would have been acting in plain disregard of the direction in the warrant, and would presumably be subject to personal liability, *see Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

I do not mean to overstate my position. I concede that this is a close case, since in determining whether tapes are "pirated", the officers must make a status judgment that could be—but on the present evidence does not appear to be—tricky. I concede that there are some categories of illicit items so general that an agent could not in most circumstances be expected reliably to pick out the items belonging to the class, e. g. all "stolen" watches. *But compare Vitali v. United States, supra*. To leave to the agent whether a watch was stolen would in many cases offer too great a potential for

---

1. A warrant to seize "heroin" is adequately descriptive even though heroin would be indistinguishable from other powers to an unpracticed eye, and can only be identified with certainty by a laboratory test made after the fact. I don't know of any requirement ruling out

after-the-fact verification so long as initial identification on some practical basis is possible. Nor do I know of any authority that the affidavit or the warrant must particularize the methods whereby the officer is to verify the true nature of the object.

mistaken seizure. The agent would have to refer to much unique, possibly disputed information; he rather than the magistrate would, as a practical matter, end up deciding what items to seize. The distinction is between an agent executing the instructions of the magistrate and an agent acting essentially on his own initiative. But while distinguishing a pirated tape doubtless requires some outside knowledge as well as reference to outside materials (i. e. lists of legitimate tapes and their manufacture), it is not really a discretionary decision, in the sense of a legal decision about which reasonable men could end up differing. It rests on objective criteria. There is little to distinguish the decisional process required of the agents here from that required of agents who are told to seize heroin or other narcotics. In the latter instance, suspicious substances are first noted by eye; they may then be "field tested"; and then following seizure the substances are tested in a laboratory. Here the pirated tapes are first ascertained by eye; they are then checked against catalogs or the like, perhaps after consultation with experts; and finally they are aurally compared, this last stage being comparable to the laboratory testing of a

drug. Both processes require essentially factual determinations. The executing agent is not vested with broad judgmental discretion to make a legal evaluation, as would be the case were he empowered to seize all "obscene" materials. *See Marcus v. Search Warrant,* 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).[2]

I thus deem this warrant sufficiently particular in its description of the items to be seized, since it could be correctly executed through use of the kind of generally available, objective information that a magistrate can assume any agent may either possess or at least easily acquire.[3] My brothers overstate matters when they speak of the warrant as requiring all information to be obtained *after* seizure. While the agents are still in the shop, they could easily screen the tapes using the catalogs of legitimate manufacturers for verification after first noting their suspicious jackets and lettering.

I can understand the court's concern lest agents be vested with broad discretionary authority to pick and choose among hard-to-distinguish items. But on this record at

**2.** The Supreme Court said in *Stanford* that the particularity requirement of the fourth amendment had to be observed with the "most scrupulous exactitude when the 'things' are books and the basis for the seizure is the ideas they contain", 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431. But while the present case involves stocks of musical tapes, the basis for seizure has nothing whatever to do with the ideas or contents of the tapes. The situation is no different from that in *United States v. Scharfman,* 448 F.2d 1355 (2d Cir. 1971) where Judge Kaufman, speaking for the panel in upholding a warrant authorizing seizure of "fur coats, stoles, [and] jackets. . . .", pointed out that when first amendment rights are not involved, the specificity requirement is more flexible. The circumstances surrounding the *Scharfman* warrant offered no greater guarantee than did the circumstances here that only properly seizable items would be impounded by the officers. One coat in the stores to be searched in *Scharfman* had been positively identified by an employee of the shippers whose furs had been hijacked, corroborating a tip which located the shipments at the fur stores in question. Here, two apparently pirated tapes were purchased from D and L by

Agent Saraceni and Wayne Thomas, a salesman for Warner/Electra/Atlantic, Inc. Those tapes were conclusively determined to be unauthorized duplications. Agent Saraceni was able because of his experience in the field to make a visual estimate that numerous other illegal records were also on the premises of D and L. And when the warrant was executed, the officers could by inspection and ultimately by aural comparison make certain that only pirated tapes were seized.

**3.** My brothers' concern over a lack of "clear standards" for ascertaining pirated tapes would be more persuasive if there were any indication that distinguishing pirated tapes from genuine ones poses a real problem. But there is no evidence that it does. Search warrants issue every day telling agents to search for narcotics, counterfeit money, betting paraphernalia, and the like, all items requiring some discernment and even after-the-fact testing, but having, at bottom an objective basis for recognition. I see no difference here. Compare *United States v. Drebin,* 557 F.2d 1316 (9th Cir. 1977) (no evidence that legal and illegal films could be distinguished by visual inspection).

least, it seems to me that the items are not that hard-to-distinguish; it seems entirely practicable to make a *prima facie* selection of "pirated" tapes, leaving untouched any unpirated items. My brothers' approach will, I fear, discourage law enforcement in an area where it may already be hard enough for legitimate producers to enlist the interest and support of enforcement personnel. If the requirements of warrants become so technical in this field that only the most sophisticated government attorneys can write them successfully, the net result will be less a blow for civil liberties than a license for continued piracy. It is, of course, important to protect against the "roving commission" of a general warrant. However, it is also important not to erect such high barriers to enforcement that the underlying substantive law, designed to protect legitimate businessmen and performers, loses its potency. The ultimate threat to civil liberties occurs when those whom the law should protect must look elsewhere for self-defense.

I see little merit to the alternative grounds urged by defendants for suppressing the fruits of the search in question. They contend that the tapes seized under the warrant were "mere evidence", unseizable because of their insufficient nexus under the standards of *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), with the particular crimes charged. On the contrary, I would consider the tapes both individually and collectively very relevant to the intent requirement of 17 U.S.C. § 104 as well as for sentencing purposes. A defendant could plausibly justify a few isolated sales of infringing tapes on grounds of oversight, clerical error or the like. The fact that a substantial part of the shop's inventory consisted of pirated tapes would be the best proof of wilfulness and sale for profit. Furthermore, the seized tapes would appear to be instrumentalities of the crime of wilful infringement for profit, not mere evidence of wrongdoing. Whether or not each becomes the subject of a separate prosecution does not enhance defendants' objection to their seizure nor their right to offer them for sale.

And, I am unable to worry about putting these defendants out of business. This could only occur because their inventory consisted entirely or mostly of tapes being offered for sale in plain violation of law—tapes which were, therefore, seizable as instrumentalities and evidence of crime. The fact that defendants' entire operation depended on items of this nature makes their conduct worse, not better. They stand in little different position than a fence who complains he is put out of business because the police seize his inventory of stolen goods.

*I would reverse the decision of the district court.*