UNITED STATES of America

v.

**John Donald LA MONTE and House of Sounds, Inc.**

Crim. No. 77–438.

United States District Court, E. D. Pennsylvania.

Aug. 3, 1978.

Edward S. G. Dennis, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Donald J. Goldberg, Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Defendants, John La Monte and House of Sounds, Inc. ("HOS"), have been charged in an 149 count indictment with racketeering (18 U.S.C. §§ 1961 *et seq.*), wire fraud (18 U.S.C. § 1343) and copyright infringement (17 U.S.C. §§ 101 *et seq.*). Defendants have moved to suppress evidence seized as a result of four separate searches conducted by agents of the FBI.

Each of the four searches occurred within a two week period in February, 1977. The

first of these involved a warrantless seizure of a tractor-trailer carrying records from HOS. The other three searches were of various business premises controlled by HOS and were conducted pursuant to three separate search warrants. A four day hearing in connection with the defendants' motion to suppress was held by the Court. At the hearing, the Court received evidence and heard argument concerning these searches. For the reasons hereinafter set forth, the Court will deny all of the defendants' motions.

### Factual Background

The investigation which gave rise to these proceedings began in New York as the result of a complaint made to the FBI by the President of Bearsville Records, who reported that counterfeit recordings of the album "Runt" by Todd Rundgren had appeared on the market. The FBI traced the counterfeit recordings to Scorpio Music Distributors, Inc. ("Scorpio"), a record outlet in Croyden, Pennsylvania. A search of the business premises of Scorpio was conducted on February 8, 1977.[1] This search uncovered approximately 50 counterfeit "Runt" albums and business records which showed that during the period from January, 1976 through December, 1976, Scorpio had received over 41,000 "Runt" albums from HOS. These business records revealed that approximately 10,000 "Runt" albums had been shipped within the preceding two months.

As a result of this information, an investigation of HOS was undertaken. During the course of this investigation, a surveillance led to the seizure, on February 10, 1977, of an Oneida tractor-trailer which contained suspect records. The trailer was taken by the FBI to the Philadelphia Naval Base where it was secured. A warrant to search the trailer was obtained on February 11, 1977 and the trailer was searched on February 21, 1977.

The defendant, John La Monte, was arrested on the evening of February 10, 1977. A search warrant was then obtained for the HOS warehouse at Quarry and Hamilton Streets in Darby, Pennsylvania. The search of the warehouse in Darby was commenced on February 11, 1977 and during the search, approximately 160,000 records were seized. Further information revealed two other locations where it was believed the defendant had stored allegedly counterfeit records, labels and other related evidence. Based upon this information, a warrant was issued on February 11, 1977 to search James Enterprise, Ltd., Second and Main Streets ("James"), and on February 23, 1977, a warrant was issued to search "Rear # 10 North 9th Street "("9th Street"), both premises located in Darby, Pennsylvania. The James search commenced on February 11, 1978 and the search of 9th Street commenced on February 23, 1977.

### I. Seizure and Search of the Oneida Tractor-Trailer.

On February 10, 1977, a confidential source who was an employee of HOS advised the FBI that the defendants were removing unusually large quantities of records from the HOS warehouse at Quarry and Hamilton Roads in Darby, Pennsylvania, and that these were not shipments in the ordinary course of business. Independent FBI surveillance revealed an Oneida Motor Freight truck leaving the HOS warehouse and arriving at the Oneida terminal in Pennsauken, New Jersey at approximately 2:45 p. m. on the afternoon of February 10, 1977. An Oneida employee stated to the FBI that the trailer was to remain at the terminal until February 28, 1977 and that it contained HOS recordings.

 At 3:15 p. m. on February 10, 1977, HOS telephoned Oneida and ordered the shipment be returned immediately to the HOS warehouse. On the return trip, on February 10, 1977, the trailer was seized by

---

1. The validity of the Scorpio search and the fruits thereof have not been challenged by the defendants in this proceeding.

the FBI in Philadelphia just after it had crossed the Walt Whitman Bridge and was taken to the Philadelphia Naval Base. The next day, February 11, 1977, a warrant was obtained for the search of the trailer. The search was not made until February 21, 1977. In seeking the admission of evidence produced by this search, the government relies upon the doctrine of "exigent circumstances," *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and does not rely upon the search warrant which was obtained the day after the seizure but before the search was conducted. We find that the facts in the instant case establish probable cause and presented the FBI with the "exigent circumstances" necessary to justify the warrantless seizure of the trailer. We reject, however, the contention of the government that the doctrine of exigent circumstances provides sufficient justification under the circumstances of this case for a warrantless search conducted on February 21, 1977, more than ten days after the seizure of the trailer. Under the facts of this case, to have seized the trailer and then to delay the warrantless search of the trailer more than ten days is clearly an unreasonable search pursuant to the doctrine of exigent circumstances.

The Supreme Court in *Chambers*, 399 U.S. at 51, 90 S.Ct. 1975, relying on *Carroll v. United States*, 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925), held that where probable cause exists to seize an automobile, a search may be made without a warrant where the car is movable and the evidence sought may be lost in the time it would take to secure a warrant. *Chambers* extended the exigent circumstances doctrine to include a later search at the police station. 399 U.S. at 52 and n. 10, 90 S.Ct. 1975. However, warrantless searches permissible under the doctrine of exigent circumstances are not without limits. As stated by the Third Circuit in *United States v. Valen*, 479 F.2d 467, 471 (3d Cir. 1973), *cert. denied*, 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974), "*Chambers* makes clear that the right to search which attaches at the time of seizure, continues to exist for a reasonable time after the seizure." *See United States v. Vento*, 533 F.2d 838, 866 (3d Cir. 1976); *United States v. Dento*, 382 F.2d 361, 366 (3d Cir.), *cert. denied*, 389 U.S. 944, 88 S.Ct. 307, 19 L.Ed.2d 299 (1967); *cf. Mincey v. Arizona*, —— U.S. ——, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Thus, we are faced with two separate determinations, first whether exigent circumstances existed to permit the warrantless seizure, and second, whether pursuant to this doctrine the warrantless search was conducted within a reasonable time after the seizure.[2] *See United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 2486, 53 L.Ed.2d 538 (1977).

The Third Circuit in *Valen* established a two-prong test to determine the existence of exigent circumstances: (1) probable cause to make the search; and (2) reasonable possibility of the agent's loss of dominion and control over the object to be searched and the consequential loss of the contraband. 479 F.2d at 470.

In the instant case, probable cause existed for the FBI to believe that the trailer contained contraband.[3] Information that the defendants were engaged in a massive record counterfeiting operation was corroborated by several sources. The seizure in

2. As stated by Judge Adams in his concurrence in *Valen*:

 If the issue presented in this appeal were one of first impression, I would be inclined to distinguish "*searches*" from "*seizures*" for the purpose of determining to what extent, if any, the government may properly (1) detain a person's suitcase (seizure), and (2) examine its contents (search), without first obtaining a warrant before either step (1) or step (2).

 The Court here holds that under the "exigent circumstances" doctrine both the warrantless seizure of appellant's suitcase and the warrantless search of its contents squares with the requirements of the Fourth Amendment. My view, as applied to the present case, would be that while sufficient probable cause existed for the warrantless seizure of appellant's luggage, the subsequent warrantless search of the suitcase's contents by Agent Clements violated the Fourth Amendment. *Id.* at 472.

3. See discussion of probable cause in connection with the warrant concerning the search of the Oneida trailer, *infra*.

the instant case also satisfied the second prong of the *Valen* test, i. e., a reasonable possibility of loss of dominion over the object of the seizure. While defendants argue that since the agents were aware of the destination of the trailer, no danger of loss of dominion existed, we disagree. First, the FBI had no way of knowing that the destination revealed by the Oneida employee was correct (the previous information concerning the length of the trailer's stay at the terminal had proven incorrect) and second, even if correct, the destination could have been changed in route—especially in light of the defendants' apparent awareness of the FBI investigation.[4]

The second question in connection with the application of the doctrine of exigent circumstances is whether a warrantless search made more than ten days after the warrantless seizure is reasonable.[5] An examination of the rationale behind the allowance of a subsequent search based on *Chambers* compels us to conclude that a warrantless search conducted more than ten days after seizure, based on the mobility exception to the warrant requirement, absent compelling circumstances not present in this case, is not reasonable.

In considering the reasonableness of the warrantless seizure and search in *Chambers*, the Supreme Court found:

> It was not unreasonable in this case to take the car to the station house. All occupants in the car were arrested in a dark parking lot in the middle of the night. A careful search at that point was impractical and perhaps not safe for the officers, and it would serve the owner's convenience and the safety of his car to have the vehicle and the keys together at the station house.

399 U.S. at 52 n. 10, 90 S.Ct. at 1981.

The rationale justifying a warrantless search pursuant to the doctrine of exigent circumstances is certainly not present in this case where the FBI waited more than ten days before conducting the search after it had secured the vehicle. Presented with an unexplained delay of this magnitude, we find that the warrantless search was not reasonable.

■ This situation is not unlike that presented to the Supreme Court in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), in which the Court was confronted with the question of whether the Fourth Amendment precluded the warrantless search of a footlocker which had been permissibly seized without a warrant from the defendant's car. The Court stated:

> Nor does the footlocker's mobility justify dispensing with the added protections of the Warrant Clause. Once the federal agents had seized [the footlocker] at the railroad station and had safely transferred it to the Boston federal building under their exclusive control, there was not the slightest danger that the footlocker or its contents could have been removed before a valid search warrant could be obtained. The initial seizure and deten-

---

4. The fact that the FBI might have obtained a warrant for the seizure of the trailer at an earlier time does not preclude a finding of exigent circumstances in this case since probable cause continued to exist and the factors which called for prompt action had just arisen. *Cardwell v. Lewis*, 417 U.S. 583, 595–96, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

5. Almost immediately after seizing the trailer, the agents conducted a cursory search of the trailer. As stated by Agent McKeen:

> "We opened the trailer up and noticed that it was loaded with tapes and records.
> "We went through some of the boxes, but the area was very dark. It was about five-thirty in the evening. It was dark out; it was raining, I believe, and it was my decision that

at that time, rather than try to determine what, if any, were counterfeit in that trailer, we would secure the trailer until we had a better opportunity to go through it." (N.T. 130).

Other than contending that exigent circumstances did not exist to make the seizure, defendants apparently do not challenge this search. In light of our finding that exigent circumstances existed to make the seizure, and since this search followed almost immediately after the seizure, we find that this warrantless intrusion was reasonable. *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *United States v. Vento*, 533 F.2d 838, 866 (3d Cir. 1976).

tion of the footlocker, the validity of which respondents do not contest, were sufficient to guard against any risk that evidence might be lost. With the footlocker safely immobilized, it was unreasonable to undertake the additional and greater intrusion of a search without a warrant.

*Id.* at 13, 97 S.Ct. at 2484–85 (footnotes omitted). Here, as Agent McKeen's testimony demonstrates, the trailer was taken to the Philadelphia Naval Base after its seizure, where it was secured. As Chief Justice Burger concluded in *Chadwick*:

Here the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency. Even though on this record the issuance of a warrant by a judicial officer was reasonably predictable, a line must be drawn. In our view, when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority.

*Id.* at 15, 97 S.Ct. at 2485–86. The government produced no justification whatsoever for delaying the search eleven days after seizure. Under the doctrine of exigent circumstances, upon which the government relies, we find that the warrantless search was unreasonable. However, our conclusion that the warrantless search was unreasonable does not conclude the matter since a warrant was obtained after the seizure, but before the search. The fact that the government relied on the doctrine of exigent circumstances for the seizure clearly would not preclude it from obtaining a warrant for the search. This is precisely the procedure endorsed by the Supreme Court in *Chadwick*, 97 S.Ct. at 2485; *cf. United States v. Allen*, 566 F.2d 1193, 1194 (3d Cir. 1977); *United States v. Simmons*, 444 F.Supp. 500, 506 (E.D.Pa.1978). Inasmuch as we have heretofore found that the warrantless seizure of the trailer was justified under the doctrine of exigent circumstances, but that a warrantless search conducted more than ten days after the seizure was unreasonable under the circumstances, we must now determine whether the search was nevertheless valid in that a warrant was obtained.[6]

Defendants contend that the information set forth in the affidavit that the defendants were engaged in a massive record counterfeiting operation is insufficient to meet the two-pronged test of credibility and reliability set forth in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).[7] The FBI had information from Paul Fishkin, President of Bearsville Records Company[8] and Jack Francis, Chief In-

**6.** The warrant was issued on February 11, 1977 and was not executed until February 21, 1977. Defendants contend that the search was invalid since it was not executed within ten days as prescribed by Fed.R.Crim.P. 41(c). However, Fed.R.Crim.P. 45(a) provides that "[i]n computing any period of time the day of the act or event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included . . . ." Thus, the warrant was executed within the ten day period. *See also, United States v. Senecal*, 36 F.2d 388 (D.Mass.1929).

**7.** Defendants contend that where copyright infringement is alleged, the search warrant affidavit must contain allegations to negate legitimate possession. *See United States v. Bily*, 406 F.Supp. 726, 732 (E.D.Pa.1975). While this may be required for the seizure of albums pursuant to 17 U.S.C. § 104, the warrant in question was also based on 18 U.S.C. § 2318, which does not require a showing that an album's copyright is not owned by the defendant. *See United States v. Shultz*, 482 F.2d 1179 (6th Cir. 1973). *Cf. United States v. Giacalone*, 541 F.2d 508, 514–15 (6th Cir. 1976).

**8.** The defendants allege, and the government concedes, that the information provided by Mr. Fishkin regarding Bearsville's ownership of the copyright to the "Runt" album was incorrect. In fact, the copyright is owned by Earmark Music, Inc., a corporation owned by the same individual who owns Bearsville and which occupies the same building as Bearsville. Defendant contends that this representation of fact should lead to the invalidation of the warrant because it is material. In the alternative,

vestigator, Anti-Piracy Division of the Recording Industry Association of America, Inc., to the effect that the defendant did not have the authority to produce or distribute the five named albums. The defendants, relying on *Aguilar* and *Spinelli*, contend that the affidavit is inadequate in that it does not contain specific allegations of reliability concerning these individuals. We reject this reasoning under the circumstances of this case. Where there exists a substantial basis on the face of the affidavit to credit the hearsay, the reliability requirement is satisfied. *See United States v. Harris*, 403 U.S. 573, 581, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Here the statements were made by persons whom the affidavit identifies as being persons whose positions of employment would have given them the opportunity to personally observe the allegations contained in the affidavit. An employee's personal observations have "built-in" indicia of reliability. *United States v. Hunley*, 567 F.2d 822, 825 (8th Cir. 1977); *United States v. Swihart*, 554 F.2d 264, 268–69 (6th Cir. 1977); *United States v. Simmons*, 444 F.Supp. 500, 505 (E.D.Pa. 1978); *see United States v. Darensbourg*,

citing *United States v. Carmichael*, 489 F.2d 983 (7th Cir. 1973) and *United States v. Thomas*, 489 F.2d 664 (5th Cir. 1973), *cert. denied*, 423 U.S. 844, 96 S.Ct. 79, 46 L.Ed.2d 64 (1975), defendants argue that the representation, if not material, is reckless. *Thomas* requires the suppression of evidence if the affidavit supporting the warrant contains either (1) intentional misrepresentations whether or not material; or (2) any material misrepresentations. *Carmichael* sets out a somewhat different standard and requires suppression if the affidavit contains either (1) intentional misstatements whether or not material; or (2) reckless misrepresentations whether or not material. We need not decide which standard to apply since, in the instant case, under either standard the affidavit would be upheld. *See United States v. Armocida*, 515 F.2d 29, 41 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). The misrepresentation does not affect the validity of the affidavit in the instant case. It was not material since the defendant was not the owner of the copyright. Even though Bearsville did not have direct ownership, the copyright was held by a related company. It was also not a reckless error, a thorough investigation led to the conclusion stated in the affidavit and was understandable under the circumstances.

520 F.2d 985, 988–89, *modified*, 524 F.2d 233 (5th Cir. 1975); *United States v. Burke*, 517 F.2d 377, 380–81 (2d Cir. 1975). In addition, the statements in the affidavit tend to corroborate each other; thus, a substantial basis exists to credit the testimony that the defendants had no authorization to produce the albums listed. While this would be sufficient to satisfy the *Aguilar-Spinelli* test, in this case there is the additional safeguard of the personal observation of the agents conducting surveillance of the truck and their questioning of the Oneida employee. The FBI surveillance and questioning reasonably alerted the agents to the fact that the defendants might attempt to dispose of evidence. *See Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Swihart*, 554 F.2d at 269–70. The statements of the named informants and the unnamed employee of HOS, each of whom was in a position which afforded reliability to his information, coupled with the independent corroboration of the FBI agents, presented the magistrate with sufficient evidence to reasonably find probable cause.[9]

9. The defendants also contend that the information contained in the affidavit is unreliable because it is undated. Undated information, however, is not per se unreliable. It is axiomatic that there must exist a sufficient basis in the affidavit for the magistrate to conclude that probable cause exists at the time he issues the warrant. *Sgro v. United States*, 287 U.S. 206, 210, 53 S.Ct. 138, 77 L.Ed. 260 (1932). This sufficient basis may arise from a number of factors. "[I]f an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Bastida v. Henderson*, 487 F.2d 860, 864 (5th Cir. 1973). *Cf. United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972).

In the instant case the magistrate could readily infer that all the information in the affidavit was acquired on or about February 2, 1977 at which time the investigations began to focus on the "Runt" album. Information specifically relating to the defendants did not begin to develop until after the search of Scorpio on February 8, 1977. Although the date of the Scorpio search is not mentioned in the affidavit, the same magistrate issued both the warrant for the Scorpio search and the one for the search of the Oneida trailer three days later on February 11, 1977. The information was still devel-

Defendants also contend that the warrant is insufficient on its face in that the description of the property to be seized was so broad and ill-defined that the searching officers, rather than the issuing magistrate, determined the scope and content of the seizure. The warrant describes the property to be seized as follows:

Unauthorized and infringing copies of copyrighted sound recordings, unauthorized and infringing sound recordings of copyrighted musical compositions, any phonograph record, disk, wire, tape or other article on which sounds are recorded, to which or upon which is stamped, posted or affixed any forged or counterfeit label, any master stampings, master tapes, or other devices and equipment used to reproduce unauthorized and infringing copies of copyrighted sound recordings or copyrighted musical compositions, business records relating to the manufacture, distribution and sale of aforesaid recordings, and other evidence of a crime, fruits of a crime, and items designed, used or intended to be used to commit a crime, to wit: The sale for profit of unauthorized and infringing copies of copyrighted sound recordings and copyrighted musical compositions, and the interstate transportation, sale or receipt of phonograph recordings bearing forged or counterfeit labels, in violation of Title 17, United States Code, Section 1(a), 1(e), 1(f), 101(e), 104 and Title 18, United States Code, Section 2318. The aforesaid recordings include, but are not limited to: "Runt" by TODD RUND-GREN, manufactured by Bearsville Record Company, 75 East 55th Street, New York, N.Y., "Golden Oldies for WCAU," "Deep Purple," "Shades of Deep Purple," and "Book of Talisin."

■■ The Fourth Amendment provides that no warrant shall issue except upon probable cause and "particularly describing the place to be searched, and the persons or things to be seized." In determining whether the description of the items to be seized is sufficient to comport with the Fourth Amendment, the Supreme Court has stated:

---

oping on February 10, 1977, the day of the seizure of the trailer.

A reasonable reading of the affidavit indicates that the statement by Mr. Francis was recently obtained. The affidavit states:

10. An interview with Mr. ALAN NIEDERMAN, Vice President of Clarion Record Manufacturing Company, Inc., 1021 Ridge Avenue, Philadelphia, Pa., disclosed the following:

a. NIEDERMAN's company has been pressing recordings for House of Sounds and JOHN LA MONTE, president of House of Sounds, for approximately three years.

b. JOHN LA MONTE, president of House of Sounds, has supplied all stampings or lacquer recordings for phonograph records pressed by Clarion.

c. On the morning of February 10, 1977, JACK WHITE, truck driver for House of Sounds, arrived at Clarion's place of business, and removed stampings, labels and jackets for the phonograph albums entitled "Runt", "Golden Oldies for WCAU", "Deep Purple", "Shades of Deep Purple" and "Book of Talisin".

d. During the past year, Clarion has pressed approximately 90,000 "Runt" albums for House of Sounds at the direction of JOHN LA MONTE.

e. During the latter part of 1975, and early part of 1976, Clarion pressed approximately 300,000 copies of the album, "Let It Be" by the Beatles, under the Apple label. The Apple labels were supplied by House of Sounds.

f. During the past three years, Clarion has pressed several million copies of the albums attached as exhibits H through O.

11. JACK FRANCIS, Chief Investigator, Anti-Piracy, Recording Industry Association of America, Inc., 1 East 5th Street, New York, N.Y. 10022, advises that neither House of Sounds, Clarion or JOHN LA MONTE have any license or authority to manufacture, sell or distribute albums under the labels of the various companies producing the above described albums.

A reasonable interpretation of the affidavit is that Mr. Francis was contacted subsequent to the interview with Mr. Niederman. Mr. Niederman disclosed information relating to occurrences of the morning of February 10, 1977 and his statements were made in reference to the disclosures made by Mr. Niederman. As stated by the court in *United States v. Ciaccio*, 356 F.Supp. 1373, 1379 (D.Md.1972), "the *averment* of time is no longer an absolute in the light of *U.S. v. Ventresca*, [380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)] . . . if a common sense reading reasonably implies proximity in time." *See Rosencranz v. United States*, 356 F.2d 310, 315–16 (1st Cir. 1966).

The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is taken, nothing is left to the discretion of the officer executing the warrant.

*Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927); *see also Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *United States v. Johnson,* 541 F.2d 1311, 1314 (8th Cir. 1976). Specificity is required in the warrant to limit the discretion of the executing officers and to give notice to the party being searched. *United States v. Johnson,* 541 F.2d at 1315; *United States v. Marti,* 421 F.2d 1263, 1268 (2d Cir. 1970). The underlying measure of the adequacy of the description is whether, given the specificity in the warrant, a violation of personal rights is likely. *United States v. Bynum,* 386 F.Supp. 449, 461 (S.D.N.Y.1974).

Defendants rely on a recent First Circuit decision, *United States v. Klein,* 565 F.2d 183 (1st Cir. 1977), in which the Court suppressed the fruits of a search conducted pursuant to a warrant, holding that the warrant contained an insufficient description of items to be seized. The *Klein* warrant authorized the seizure of

certain 8-track electronic tapes and tape cartridges which are unauthorized "pirate" reproductions and also any commercial documentation and advertising materials relating thereto which are evidence of the commission of a criminal offense, to wit, the knowing and wilful infringement of copyrights secured by Title 17,

United States Code, in violation of 17 U.S.C. § 104.

*Id.* at 184–85. Judge Coffin, who participated in the *Klein* decision, in *In the Matter of the Application of Montilla Records of Puerto Rico, Inc. v. Morales,* 575 F.2d 324, 326 (1st Cir. 1978), summarized the *Klein* holding as follows:

Our concern in [*Klein*] involved the failure to inform the magistrate issuing the warrant how an agent would distinguish "pirate" tapes from legal merchandise so that the warrant description could effectively limit the agent's discretion. Although it appeared that there were significant visible physical differences between pirate tapes and legitimate tapes which an agent could determine, we held that the failure to delineate what those differences were made the warrant constitutionally invalid.

The warrant in the instant case provides far more guidance than that deemed insufficient in *Klein.* The warrant lists five specific albums to be seized. Samples of counterfeit and legitimate records were shown to the magistrate, and the characteristics by which the counterfeit records could easily be distinguished from legitimate records were pointed out to him.[10]

■ An examination of the warrant in this case, and of the concerns expressed by the *Klein* court, has convinced this Court that the description is sufficient. As stated in *Klein* :

The warrant does not reveal with any degree of certainty that authorized tapes will not be seized. Moreover, this defect could, we think, have been remedied if all the relevant information available to the

---

10. Paragraph 3 of the affidavit provides in pertinent part:

[T]he counterfeit albums could be distinguished from the genuine albums made by [Bearsville Record Company] as follows:

(a) The front of the record jacket on the counterfeit album displays the symbol of a bear's head (The Bearsville Record Company logo) with a faded nose and the printing of "QueensLitho" and "Ampex" is blurry on the reverse side of the jacket.

(b) The album dust cover is plain white with no markings, printing or artwork on the

counterfeit album as compared with the genuine "Runt" album dust cover which displays printing and artwork.

(c) The printing and symbols on the recording disc label is blurry on the counterfeit albums as compared with the genuine albums.

(d) The etching of the production code on the recording disc of the counterfeit album shows a different penmanship from the genuine recording disc.

government had been properly set forth. We refer, see n. 5, to averments detailing the background and expertise in the field of detecting pirate tapes of the agent and such current indicia of illegality as the crudeness of tape jackets, the obscurity of recording company names, and the lack of known association of such a company with a known artist. . . . Had Agent Saraceni's affidavit detailed his expertise in this area, indicated the basis upon which he had concluded that 500 or more pirate tapes were on the premises (such as visual indicia noted above), and explained how those indicia identify pirate tapes to the trained observer, a valid warrant could have been issued.

565 F.2d at 188. In the instant case, the magistrate was presented with before the fact guidance as to how the allegedly counterfeit records could be distinguished from others. Our own review of the material submitted to the magistrate prior to his issuance of the warrant convinces us that the indicia for identifying counterfeit records was not left "to the discretion of the officer[s] executing the warrant" but was readily apparent on the basis of the easily identifiable characteristics listed in the affidavit. Moreover, the instant warrant provided further guidance by listing five specific titles of suspected counterfeit albums. *See In the Matter of the Application of Montilla Records of Puerto Rico, Inc. v. Morales,* 575 F.2d at 326 (1st Cir. 1978).[11]

As stated by Judge Campbell in his dissent in *Klein:*

> I can understand the court's concern lest agents be vested with broad discretionary authority to pick and choose among hard-to-distinguish items. But on

this record at least, it seems to me that the items are not that hard-to-distinguish; it seems entirely practicable to make a *prima facie* selection of "pirated" tapes, leaving untouched any unpirated items. My brothers' approach will, I fear, discourage law enforcement in an area where it may already be hard enough for legitimate producers to enlist the interest and support of enforcement personnel. If the requirements of warrants become so technical in this field that only the most sophisticated government attorneys can write them successfully, the net result will be less a blow for civil liberties than a license for continued piracy. It is, of course, important to protect against the "roving commission" of a general warrant. However, it is also important not to erect such high barriers to enforcement that the underlying substantive law, designed to protect legitimate businessmen and performers, loses its potency. The ultimate threat to civil liberties occurs when those whom the law should protect must look elsewhere for self-defense.

*Id.* at 192–93. This Court finds that the description of the property to be seized is not unconstitutionally broad and ill defined.

## II. Search of HOS Warehouse.

On February 11, 1977, pursuant to a search warrant, agents of the FBI conducted a search of the HOS warehouse, Quarry and Hamilton Streets, Darby, Pennsylvania. As a result of this search which took approximately ten days, one hundred sixty thousand LP albums, out of a total inventory of some twenty million, were seized.

---

11. The warrant in this case presented to the magistrate more than a mere generic description of articles to be seized, as was the case in *Klein.* On occasion, however, the mere generic description of items has been held sufficient to uphold a warrant. Thus, in *Spinelli v. United States,* 382 F.2d 871, 886 (8th Cir. 1967), *rev'd on other grounds,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the Eighth Circuit upheld a warrant for "bookmaking paraphernalia," stating:

> When the circumstances of the crime make an exact description of the fruits and instru-

mentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking. *See United States v. Scharfman,* 448 F.2d 1352 (2d Cir. 1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 944, 30 L.Ed.2d 789 (1972) (warrant for "fur coats" held sufficient); *Vitali v. United States,* 383 F.2d 121 (1st Cir. 1967) (stolen watch bands); *United States v. Averell,* 296 F.Supp. 1004 (E.D.N.Y.1969) (seizure of thousands of undescribed wigs upheld).

The warrant's description of property to be seized is the same as that contained in the warrant in connection with the search of the Oneida trailer.

Defendants raise several contentions why the evidence obtained in this search should be suppressed:

(a) The description of the premises to be searched was unconstitutionally broad in that it permitted a search of premises for which there was no showing of probable cause;

(b) The warrant was insufficient on its face in that the description of the property to be seized was so broad and ill-defined as to permit the searching officers—rather than the issuing magistrate—to determine the scope and content of the seizure.

(c) The search warrant was improperly executed in that the scope of the search and seizure was overly broad.

(a) *Description of the Premises.*

■ Defendants contend that the description of the premises to be searched was unconstitutionally overbroad. The description of the premises to be searched contained in the warrant is as follows:

> House of Sounds, Quarry and Hamilton Street, Darby, Pennsylvania, five story white stone building, two hundred feet from Hamilton Street on Quarry Street, Floors two through five, evenly spaced with tinted green windows, the first floor partially below street level, with a canopy running from a door on the first floor, left side of said building as faced from Quarry Street, the canopy sides displaying the letters "A.S.E." and the front of the canopy displaying the words "American Safety Equipment Corporation" and said door with the words "House of Sounds, Darby, Pennsylvania, Wholesale Only."

Defendants allege that this warrant permitted a search of the entire five stories of the building, which included the premises of three other tenants, and was not limited to the premises occupied by HOS. From this they conclude that since the warrant permitted a search of premises for which no probable cause existed, it was overbroad. We find that the description of the premises to be searched was sufficient to limit the agents executing the warrant to only that area occupied by HOS.

■ The standard by which the particularity of the description of the place to be searched is to be tested was established by the Supreme Court in *Steele v. United States,* 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925), wherein the Court stated, "[i]t is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." This standard is one of practical accuracy rather than one of technical nicety. *United States v. Bedford,* 519 F.2d 650, 655 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976); *United States v. Gomez,* 42 F.R.D. 347 (S.D.N.Y.1967).

In *Bedford,* the Third Circuit, following the *Steele* standard, held that a warrant directed to a premises occupied by a specified resident within a building occupied by other individuals was sufficiently specific in that it could reasonably be construed as being limited to the premises occupied by the resident identified in the warrant. There, the warrant specified that the place to be searched was the " '[r]esidence of Myrel [sic] Bedford' located at '1723 5th Ave. being a 3 story brick dwelling.' " The Court found that the description was sufficient to limit the search to Bedford's apartment even though three units existed in the same building, 519 F.2d at 655. *See also United States v. Prout,* 526 F.2d 380, 387–88 (5th Cir.), *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976); *Moore v. United States,* 149 U.S.App.D.C. 150, 152, 461 F.2d 1236, 1238 (1972); *Kenney v. United States,* 81 U.S.App.D.C. 259, 157 F.2d 442 (1946). In the instant case, the qualification in the description contained in the warrant, "House of Sounds", was sufficient to enable the agents to ascertain what did and what did not belong to the defendants. (N.T. 34–35). Each floor of the building was clearly marked as to its occupant. Since

the agents here could, and did with little effort, ascertain the specific floors occupied by HOS, we find that the description of the premises contained in the warrant was sufficiently particular. To require any more would place an undue burden on law enforcement officials without in any way protecting against the danger of searching the wrong premises.

### (b) Description of Items to be Seized.

As heretofore stated, the warrant in connection with the search of HOS contained an identical description of property to be seized as that contained in the warrant in connection with the search of the Oneida trailer. For the reasons set forth in connection with our discussion of that previous warrant, we find that the description of the items to be seized in the warrant in connection with HOS is not unconstitutionally broad and ill-defined.

### (c) Execution of the Search.

The warrant for the search of HOS was issued on February 11, 1977. FBI agents entered HOS on that day and were confronted with a warehouse in which was stored more than 20 million records. As FBI Agent McKeen stated:

> When we entered that place we had approximately six to eight agents and it was quite evident that due to the size of the location, which was these two floors, it would be impossible for the six agents to even begin to think of searching at that time. . . . Our most immediate problem was to maintain security at that location . . . we had to maintain round-the-clock occupancy of those buildings . . . . We wanted to maintain the federal presence at those locations. It was my understanding that they—we wanted to maintain our presence there and we were also concerned with the

destruction of evidence and we wanted to make sure they were secure.

(N.T. 162–64).

On the following day, Saturday, February 12, 1977, a more detailed examination of the warehouse revealed that additional manpower would be required and arrangements were made through FBI headquarters in Washington, D.C. for ten additional FBI agents experienced in copyright matters to fly in to Philadelphia to assist with the search. Saturday and Sunday were spent planning the search (N.T. 163) and additional planning sessions were held on Monday and Tuesday (N.T. 166). On Monday, it was decided that James Enterprises would be searched first because it was smaller than HOS (N.T. 165). That search was completed on Tuesday. The HOS warehouse was sectioned off on Wednesday, and on Thursday the actual search began, utilizing more agents from Philadelphia. In all, about thirty agents, working in teams, seized approximately 160,000 record albums.

Defendants contend that the agents' use of the DeWitt memorandum, a memorandum prepared following the search of James Enterprises and not previously shown to the magistrate, was improper. However, the information contained in the DeWitt memorandum was not known to the FBI at the time that the agents sought the warrant to search HOS from the magistrate and thus could not have been presented to him. We find nothing objectionable in the use of the DeWitt memorandum in that it simply provided additional information which would enable the searchers to more readily identify pirated albums described in the warrant.

█ Defendants complain that the agents seized too much, in that they seized additional copies of allegedly infringing albums when one such album would have been sufficient to prove any infringement.[12]

---

**12.** There is no first amendment issue here as defendants contend. These records were seized not to restrain freedom of expression, but because the recordings were pirated. *Sid & Marty Krofft Television v. McDonald's Corp.,* 562 F.2d 1157, 1170–71 (9th Cir. 1977); *Duchess Music Corp. v. Stern,* 458 F.2d 1305, 1311 (9th Cir.), *cert. denied,* 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972); *United States v. Bodin,* 375 F.Supp. 1265 (W.D.Okl.1974).

Under the copyright law, as it existed in 1977,[13] 17 U.S.C. § 101(d), all infringing copies of copyrighted works are subject to forfeiture and destruction. *United States v. Brown,* 400 F.Supp. 656, 658 (S.D.Miss. 1975). Generally speaking, there is no limitation on the quantity of evidence the government may seize provided, of course, that said evidence comes within the scope of the warrant. The albums seized comprise less than 1% of the albums stored in the HOS warehouse which was being searched.

■ We also find that the time period involved in the search was reasonable under all the circumstances. Both service and execution of the HOS warrant occurred within the prescribed ten-day period and probable cause continued to exist throughout that period. *See United States v. Bedford,* 519 F.2d 650–655–6 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976). The area to be searched was immense and the albums seized comprised less than 1% of the albums stored in the HOS warehouse which was being searched.

### III. Search of James Enterprises, Ltd.

On February 11, 1977, FBI agents, pursuant to a search warrant, began a search of James Enterprises, Ltd. (James), Second and Main Streets, Darby, Pa. The handwritten search warrant commanded the seizure of:

Jackets for long playing albums by recording artist Elton John and for the recording, "Greatest Hits of the Fifties" produced by Paramount Records, equipment, machinery and other property which is evidence of a crime, fruits of a crime, and items designed, used or intended to be used to commit a crime, to wit: the sale for profit of unauthorized and infringing copies of copyrighted sound recordings and copyrighted musical compositions, and the interstate transportation,

sale or receipt of phonograph recordings bearing forged or counterfeit labels, in violation of Title 17, United States Code, Sections 1(a), 1(e), 1(f), 101(e), 104 and Title 18, United States Code, Section 2318.

As a result of this search, promotion photos, assorted posters, album covers for various records, jacket covers for various albums and uncut labels were seized (Joint Exhibit 6) (N.T. 165). Defendants contend that the fruits of this search should be suppressed since the description of the property was too broad; the warrant issued on an insufficient showing of probable cause, and the warrant was improperly executed in that the agents failed to announce the authority and purpose of the search and that the scope of the search and seizure was overly broad.

(a) *Description of the Property to be Seized.*

The warrant in connection with the search of James is similar to those issued in connection with the searches of the Oneida trailer and HOS. The magistrate was presented with nearly identical information in connection with each. For the reasons set forth in connection with our description of those previous warrants, we find that the description of the items to be seized in the James warrant is not unconstitutionally broad and ill defined.

(b) *Probable Cause.*

The affidavit presented to the magistrate in connection with the search of James contained the identical thirteen allegations set forth in the HOS affidavit and the affidavit in connection with the search of the Oneida trailer. In addition, it contained five handwritten paragraphs which provide:

14. Statement of confidential source employed by House of Sounds that James Enterprises, LTD at 2nd and Main Streets, Darby, Pennsylvania is a warehouse facility for John La Monte and

---

**13.** Pub.L.No. 94–553, Title I, § 112, 90 Stat. 2600 (October 19, 1976) provides: "All causes of action that arose under [former Title 17] before January 1, 1978, shall be governed by [Title 17] as it existed when the cause of action arose." The revised Title 17 became effective on January 1, 1978. *See* 17 U.S.C.A. § 503 (1978).

House of Sounds. Source advised that he knew that La Monte used the James Enterprises premises in his business enterprise.

15. Statement of a Darby Police Officer that John La Monte uses the James Enterprises, LTD premises at Second and Main Streets, Darby, Pa.

16. Agents of the F.B.I. were admitted to the James Enterprises, LTD premises by a workman and there observed in plain view jackets for long playing record album "OLD GOLD FROM THE FABULOUS 50'S" and other inventory marked "E. JOHN."

17. Clarion Record Manufacturing Company advised that "OLD GOLD FROM THE FABULOUS 50'S" and "FRIENDS" by ELTON JOHN were pressed by Clarion for JOHN LA MONTE. (See Exhibit "P").

18. Representatives from the Recording Industry Association of America advise that neither John La Monte, House of Sounds, nor Clarion have any authority to press the above albums under the Paramount.

The defendants challenge the sufficiency of the affidavit on two grounds, first, that the allegations contained in paragraphs 14 through 18 are undated and, second, that there is an insufficient showing of the reliability of the information. We disagree with both contentions.

■ As heretofore pointed out in our discussion of the warrant for the search of the Oneida trailer, we believe that the chronology of events recited in the affidavit permitted the magistrate to infer that the probable cause information relating to the defendants' record counterfeiting operation was acquired after the search of Scorpio Music Distributors, Inc. on February 8, 1978. Similarly, for the reasons set forth in connection with that discussion, we also find that the information set forth in the affidavit contained sufficient indicia of reliability and that the magistrate was presented with a substantial basis on the face of the affidavit to credit the information presented therein. *United States v. Harris*, 403 U.S. 573, 581, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *see United States v. Simmons*, 444 F.Supp. 500, 505 (E.D.Pa.1978).

■ Defendants also contend that the information disclosed in paragraph 16 of the affidavit was obtained as a result of an illegal search. Paragraph 16 states that FBI agents were admitted to the premises by a workman and while on the premises observed the record jackets for counterfeit albums. There is nothing in this record which could serve as a basis for the Court to find that this observation was illegally made.[14] *Cf. United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Green*, 523 F.2d 968, 971 (9th Cir. 1975); *United States v. Murphy*, 506 F.2d 529 (9th Cir. 1974), *cert. denied*, 420 U.S. 996, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975); *United States v. Sells*, 496 F.2d 912, 914 (7th Cir. 1974).

---

**14.** The burden of proof to be carried at a suppression hearing is proof by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). In this case, the government's affidavit in connection with the James warrant states that the agents were admitted to James by a workman. This allegation was corroborated by the testimony of Agent McKeen. The defendants in no way contradict this evidence. It appears that a movant has the burden of proof in a suppression hearing, *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *United States v. Phillips,* 540 F.2d 319, 325–26 (8th Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976); *United States v. Gardner,* 537 F.2d 861, 862 (6th Cir. 1976); *Government of Virgin Islands v. Gereau,* 502 F.2d 914, 922 (3d Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Vigo,* 413 F.2d 691, 693 (5th Cir. 1969); *United States v. Lyon,* 397 F.2d 505, 508 (7th Cir.), *cert. denied*, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968); *Fullbright v. United States,* 392 F.2d 432, 435–36 (10th Cir.), *cert. denied,* 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968); *United States v. Masterson,* 383 F.2d 610, 614 (2d Cir. 1967), *cert. denied,* 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1147 (1968), and we find that defendants have failed to meet their burden. Moreover, even if the government had this initial burden, on the basis of this record we would find that it proved consent by a preponderance of the evidence. *Cf. United States v. D'Andrea,* 495 F.2d 1170, 1174 (3d Cir.), *cert. denied,* 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974).

**966**

(c) *Execution of the Warrant.*

 Defendants contend that the warrant for the James search was improperly executed alleging that the agents executed the warrant without the requisite "knock and announce" procedures in violation of 18 U.S.C. § 3109,[15] in that they did not reveal their identity before they entered the premises nor did they reveal the existence of the search warrant. *Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *Miller v. United States*, 357 U.S. 301, 306, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *United States ex rel. Manduchi v. Tracy*, 350 F.2d 658, 660–61 (3d Cir.), *cert. denied*, 382 U.S. 943, 86 S.Ct. 390, 15 L.Ed.2d 353 (1965).[16] Defendants argue that the "knock and announce" requirement was not futile in that the testimony at the hearing shows that the agents, prior to entry, did not know if anyone was on the premises. A review of the testimony reveals, however, that defendants' argument is without merit.

Special Agent Flagg testified on cross-examination:

(Q) What was done to the best of your recollection when you approached James Enterprises and what did you do?

(A) To the best of my recollection we were trying to determine if there was any occupants to the building. There was no occupants to the building, therefore,—

(Q) How did you attempt to determine if there were any occupants?

(A) By looking in the windows, knocking on the door, et cetera.

 * * * * * *

(Q) Did you hear anyone else say something?

(A) Yes.

 * * * * * *

(Q) What did they say?

(A) They said, "Is anybody in there?" and they knocked on the door; and that was basically it. . . . There was no response.

 * * * * * *

(Q) Do you recall how long you knocked on the door or someone knocked on the door?

(A) It wasn't a long period of time— five minutes at the most. . . . We waited five minutes and then we discussed what we were going to do. After we determined a reasonable amount of time, that there was nobody from the premises, we discussed with the United States Attorney and he made the decision at that point.

(N.T. 105–06). Moreover, Agent McKeen testified that prior to the search the agents knocked on all the doors and said that they were FBI. (N.T. 214). Thus, we find that the agents did knock and attempt to announce their purpose prior to execution of the warrant. Moreover, as the Court in *Payne v. United States*, 508 F.2d 1391, 1393–94 (5th Cir.), *cert. denied*, 423 U.S. 933, 96 S.Ct. 287, 46 L.Ed.2d 263 (1975), pointed out, 18 U.S.C. § 3109 has no applicability (at least with respect to its "knock and announce" requirements) to unoccupied dwellings:

> The three interests which are protected by requiring announcement and refusal prior to breaking in are: (1) the prevention of violence and physical injury to the police and the occupants; (2) the unexpected exposure of the private activities of the occupants; (3) the property damage resulting from forced entry. Only the third and least significant in terms of individual privacy can possibly be involved when the occupant is absent from

---

**15.** *18 U.S.C. § 3109 provides in pertinent part:*

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance
. . . .

**16.** It appears that a locked commercial establishment is a "house" for purposes of 18 U.S.C. § 3109. *United States v. Agrusa*, 541 F.2d 690, 700 (8th Cir. 1976), *cert. denied*, 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977); *United States v. Phillips*, 497 F.2d 1131, 1133 (9th Cir. 1974); *but see United States v. Johns*, 466 F.2d 1364, 1365 (5th Cir. 1972).

the premises. It is futile to require the police to wait for refusal of admittance to a dwelling when no one is home. (footnote omitted).

See also *United States v. Brown*, 556 F.2d 304, 305 (5th Cir. 1977); *United States v. Agrusa*, 541 F.2d 690, 700 (8th Cir. 1976), *cert. denied*, 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977); *United States v. Gervato*, 474 F.2d 40, 44 (3d Cir.), *cert. denied*, 414 U.S. 864, 94 S.Ct. 39, 38 L.Ed.2d 84 (1973); *United States v. Hawkins*, 243 F.Supp. 429, 432–33 (E.D.Tenn.1965).

Finally, defendants contend that the scope of the seizure was overly broad. They base this contention on the statement of Agent McKeen, "[b]ased on the information we received we decided to take everything out of James, the slicks and the album jackets, and all the evidence that was there." (N.T. 165). They argue that "everything" included such clearly non-infringing items as "assorted posters" and "raw cardboard for album covers", and rely on *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) and *Kremen v. United States*, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1956) for their proposition that all evidence seized as a result of the James search should be suppressed. An examination of these cases reveals that neither is applicable to the instant situation inasmuch as neither involved the question of whether a valid search warrant had been properly executed. In *Stanford,* the Court suppressed evidence obtained as a result of a warrant which did not describe the property to be seized with sufficient particularity, holding that the warrant itself was invalid. *Kremen* involved a seizure for which no warrant had ever been obtained. As we have heretofore found, the warrant in connection with the James search described the property to be seized with sufficient particularity and we are here presented with a question of execution of the warrant and not of the validity of the warrant itself. In the event that the Court had been presented with evidence that certain items seized were not within the description in the warrant, those items would have

been suppressed. However, the fact that items outside the warrant had been seized does not necessitate suppressing those items which fall within the description. As recently stated by the Third Circuit in *United States v. Forsythe*, 560 F.2d 1127 (3d Cir. 1977):

> The appellees assert that the search was unconstitutional because the agents seized some items not listed in the search warrant. They argue that because of this, all the evidence seized should be suppressed. The district court implicitly rejected this argument and correctly so. *See Andresen v. Maryland, supra,* 427 U.S. at 482 n. 11, 96 S.Ct. 2737. . . . Assuming *arguendo* that the seizure of items not listed in the warrant was illegal, this does not justify suppression of highly probative evidence consisting of those documents and records which were legally seized pursuant to a valid warrant.

*Id.* at 1134 (footnote omitted). Moreover, there was no evidence presented which would in any manner permit this Court to conclude that items seized allegedly outside the description in the warrant in any way could have served as a poisonous tree producing fruits that would invalidate the other searches involved herein.

IV. *"Rear # 10 North 9th Street".*

Defendants raise similar contentions in support of their motion to suppress the evidence seized during this search as they do in connection with the previous searches. This motion, too, will be denied.

Defendants contend that this warrant, too, was insufficient on its face in that the description of the property was so broad and ill-defined as to permit the searching officers—rather than the issuing magistrate—to determine the scope and content of the seizures, and because the warrant issued on an insufficient showing of probable cause. The description of property to be seized in this warrant is identical to that contained in the warrant for the search of the Oneida trailer and, for the reasons set forth in connection with the discussion of that warrant, we find this description was

not unconstitutionally broad and ill-defined. Also, on the basis of our previous discussion we find that there existed sufficient probable cause to justify issuance of the warrant.

■ Defendants also contend that this search was improper since entry was made without the requisite announcement of authority and purpose. Entry was effected with a key obtained from Mark Townsend, a HOS employee. As stated by Agent Flagg:

> I, along with other agents of the FBI, entered Ninth and Main. We used a key that was given to us by Mark Townsend to enter the premises with a search warrant.
>
> There were no people visible [and] there was nobody at the premises at the time we entered.
>
> The key opened the door. We went inside. . . . ·

(N.T. 40).[17] The use of a key to effect entry is as much a "breaking" for purposes of 18 U.S.C. § 3109, as is entry achieved by breaking a window.[18] However, as we have previously pointed out in connection with our discussion of the James search, other than those procedural requirements directed at avoiding breaches of the peace, the requirements of 18 U.S.C. § 3109 have no applicability where the premises are not occupied. *United States v. Brown*, 556 F.2d 304, 305 (5th Cir. 1977); *United States v. Agrusa*, 541 F.2d 690, 700 (8th Cir. 1976), *cert. denied*, 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977); *Payne v. United States*, 508 F.2d 1391, 1393–94 (5th Cir.), *cert. denied*, 423 U.S. 933, 96 S.Ct. 287, 46 L.Ed.2d 263 (1975); *United States v. Gervato*, 474 F.2d 40, 44 (3d Cir.), *cert. denied*, 414 U.S. 864, 94 S.Ct. 39, 38 L.Ed.2d 84 (1973); *Unit-*

ed States v. Hawkins*, 243 F.Supp. 429, 432–33 (E.D.Tenn.1965).

Finally, defendants contend that the scope of the seizure was overly broad and thus all evidence seized as a result of the search should be suppressed. As we heretofore stated in connection with the James search, had the Court been presented with evidence that certain items seized were not within the description in the warrant, those items would have been suppressed. However, the fact that items outside the warrant had been seized does not necessitate suppressing those items which fall within the description. *United States v. Forsythe*, 560 F.2d 1127, 1134 (3d Cir. 1977).

Accordingly, for the reasons heretofore set forth, the Court will enter an Order denying defendants' motions to suppress the evidence seized during the four searches.

---

**17.** Agent McKeen testified on cross-examination:

> Q. Now moving to the search of North Ninth Street, I gather that the entry there was by key; is that right?
> A. That's correct.
> Q. But in all other respects the manner of entry is statements made by the FBI *outside* and would have been the same as in the other searches; is that correct?
> A. That's correct.

(N.T. 218). In connection with the search of James, Agent McKeen had previously testified

that prior to entry the agents knocked and stated that they were FBI agents (N.T. 214); thus, one might infer from his testimony that the agents knocked and announced themselves prior to entering North 9th Street.

**18.** Similarly, opening a closed but unlocked door is a "breaking" within the meaning of 18 U.S.C. § 3109. *Sabbath v. United States*, 391 U.S. 585, 589–90, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *United States v. Teti*, 422 F.Supp. 128, 135 (E.D.Pa.1976).